# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF DELAWARE

| | |
|---|---|
| In re: | Chapter 11 |
| MANISTIQUE PAPERS, INC., | Case No. 11-12562 (KJC) |
| Debtor. | |

## DECLARATION OF JON JOHNSON IN SUPPORT OF
## THE DEBTOR'S CHAPTER 11 PETITION AND FIRST DAY MOTIONS

I, Jon Johnson, declare:

I am over 18 years of age and, if called as a witness, could and would testify as to the matters set forth below based upon my personal knowledge, except where otherwise indicated below:

### BACKGROUND

1.  I am the General Manager of Manistique Papers, Inc. (the "Debtor" or the "Company"). I am intimately familiar with the business operations and assets of the Debtor.

2.  I hereby submit this declaration in support of the following pleadings filed by Debtor:

> (a)  Voluntary Petition and documents filed in support thereof;

> (b)  Motion of the Debtor for Entry of an Order Pursuant to Sections 105(a), 363 and 345 of the Bankruptcy Code and Local Rule 2015-2 Authorizing the Debtor to (I) Maintain and Use its Existing Bank Accounts and Business Forms, (II) Maintain and Use its Existing Cash Management System, and (III) Waive the Requirements of Section 345 of the Bankruptcy Code (the "Cash Management Motion");

(c)     Debtor's Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a), 363(b), 363(c), 1107(a) and 1108 and Fed. R. Bankr. P. 6003 and 6004 (I) Authorizing the Debtor to (A) Honor and Perform Certain Prepetition Obligations to Customers; (B) Continue Customer Programs and (C) Honor Certain Other Prepetition Obligations Necessary to Maintain the Existence of Customer Programs; and (II) Granting Related Relief (the "Customer Programs Motion");

(d)     Debtor's Motion for Entry of Order Pursuant to Sections 105(a), 363(b), 363(c), 507(a), 541(b)(7), 541(d), 1107(a) and 1108 of the Bankruptcy Code and Fed. R. Bankr. P. 6003 and 6004 (I) Authorizing Debtor to (A) Pay Certain Prepetition Wages, Compensation and Employee Benefits, and (B) Continue Payment of Wages, Compensation, and Employee Benefits in the Ordinary Course of Business; and (II) Authorizing and Directing Banks and Other Financial Institutions to Receive, Process, Honor and Pay Checks Issued and Electronic Payment Requests Relating to the Forgoing (the "Wage Motion");

(e)     Debtor's Motion for Entry of an Interim and Final Order Pursuant to 11 U.S.C. §§ 105(a) and 366 (I) Prohibiting Utilities from Altering, Refusing, or Discontinuing Services on Account of Prepetition Invoices, (II) Deeming Utilities Adequately Assured of Future Performance, and (III) Establishing Procedures for Determining Adequate Assurance of Payment (the "Utilities Motion");

(f)     Debtor's Motion for Entry of an Order Pursuant to 11 U.S.C. §§ 105(a), 363(b), 363(c), 1107(a), and 1108 and Fed. R. Bankr. P. 6003 and 6004 Authorizing the Debtor to Honor Prepetition Obligations to and Continue Prepetition Practices with Shippers, Warehousemen and Other Lien Claimants (the "Warehouse Motion"); and

(g)     Debtor's Motion for the Entry of Interim and Final Orders Pursuant to Sections 105, 361, 362, and 363 of the Bankruptcy Code (I) Authorizing Debtor to Use Cash Collateral; (II) Granting Adequate Protection to the Debtor's Prepetition Secured Lender and (C) Scheduling a Final Hearing (the "Cash Collateral Motion").

3.     I supervise the custodians of the books and records of the Debtor relating to financial and commercial transactions and am generally familiar with the Debtor's procedures for maintaining records and files and recording transactions into the Debtor's books and records. The books, records and files of the Debtor are maintained in the normal course of business, with all of the entries made by the Debtor's employees at or about the time the events that were recorded therein occurred. Unless otherwise indicated, all statements below are based on the contents of the Debtor's books, records and files.

4.     The Company is a 100 percent recycled fiber facility and a leading North American producer of high-bright groundwood specialty papers (www.manistiquepapers.com). The Company's primary market is commercial printing, with niche positions in food service and office products. The Company is a low cost producer into its key Midwest markets.

5.     The Company operates a nearly 100 year old facility along the Manistique River in Manistique, Michigan (the "Mill"). The Mill is a critical component of the continued economic viability of the Manistique community. The Company employed approximately 150 people within Manistique. It is one of the community's largest employers.

6.     This enterprise, despite the current economic conditions and financial constraints it faces, has been an integral part of the community for nearly 100 years -- providing direct employment to generations of workers and indirect economic benefits for the entire state.

7.     The Mill consists of a 500-ton per day recycled fiber facility, one paper machine, two boilers, and a waste water treatment facility. The Mill is able to produce 125,000 tons per year. Its product is primarily commercial advertising paper with some educational workbooks and food service and office products.

8.     The Mill was built in 1914 by W.J. Murphy, then owner of the Minneapolis Tribune, and began manufacturing paper in 1920. The Company was sold to Mead Corporation in 1940 and changed ownership twice in the following 20 years, ending up in the hands of the Marshall Field family in 1959. The Mill began recycling fiber as early as 1959.

9.     In 1984 the Company shut down its wood processing operations and converted to 100% recycled paper. In 1991, Kruger Inc. ("Kruger") acquired the Company from Marshall Field and completed a $13 million upgrade to a deinked pulping system.

10.     In 2006 the Company was purchased from Kruger by a holding company made up of private equity firm, Merit Capital Partners ("Merit"), and minority shareholder DDFKD Investments, LP, was owned by Don and Dennis Kramer (the "Kramers") owners of Remark Paper Co., Inc. ("Remark"). The Kramers were in charge of managing the Mill from November of 2006 until January of 2011.

11.     The Company operates a complete wastewater treatment facility through which approximately five million gallons of wastewater is purified daily.

12.     The Company purchases recovered fiber from municipalities in Michigan, Wisconsin, Illinois, Minnesota, Ohio, Indiana, North Dakota, Missouri, South Dakota, Iowa, Kentucky, and Pennsylvania.

13.     The Company has shipped paper to all 48 states of the continental United States, Canada, Mexico, Argentina, Brazil, the Philippines, India, and Japan.

14.     Since January 2011, the cost of raw material has increased one million dollars each month, impacting the bottom-line revenue of the Company. In roughly that same period of time, due to economic conditions the orders of the Company's products dropped almost 30% from anticipated levels. The result of this unanticipated decline in orders resulted in excess inventory and lost revenues.

15.     In addition, Remark, headquartered in Wheeling, Illinois, did not pay money owed to the Company last week for product already delivered, significantly reducing cash available to pay expenses.

16.     The Company has been working with its lender, RBS Citizens, National Association ("RBS Citizens"), headquartered in Providence, Rhode Island, as well as other potential lenders to seek capital that could keep the business operational. RBS Citizens is owed approximately $11.1 million dollars of secured debt. The Company was recently informed by RBS Citizens that it would not provide an extension of the credit line and the necessary working capital needed to continue operations. Accordingly, paper production ceased Friday, August 5, 2011, though the company continues to ship inventory and maintain equipment.

17.     The Company's subordinated debt holders, Merit Mezzanine Fund IV, L.P. and Merit Mezzanine Parallel Fund, IV, L.P., are Delaware limited partnerships, holding nearly $33 million in subordinated debt.

18.     Despite the vast improvements engineered by the Company at the Mill, the general economic conditions in the country and the region have affected the Company's performance and its ability to obtain financing. The paper industry itself has been subject to fluctuating market conditions, moreover, that at times have had significant adverse effects.

19. Historically, the Company has relied upon the newsprint market to fill holes in the production schedule during the time of the year when commercial printing and retail advertising is slow. The newsprint market continues to be challenged by electronic media and, although manufacturers have taken millions of tons of capacity off the market in the past decade, the market remains in an oversupplied condition with very low pricing. Commercial printing has also been sluggish as advertisers who relied upon the newspaper to carry their message to the masses moved away from print and embraced the internet.

20. Additionally, the Company has a large part of its order book devoted to the educational workbook market during the first half of the year. Due to economic conditions in 2011 school districts have major budget constraints and the orders for these books did not materialize, leaving the Company searching for alternatives to fill machine time and having to take orders with lower selling prices.

21. The Company has been in the process of developing new grades to provide an alternative to selling into the newsprint and commercial printing market. The emphasis on these grades started in February, 2011 with market research and product development going on until June. The first production runs were attempted in July and more were scheduled for the latter half of the year. Unfortunately, due to the Company's financial condition, the development could not continue.

22. On August 12, 2011 (the "Petition Date"), the Company commenced its reorganization case by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code.

23.     The Company is continuing in possession of its property, and is operating and managing its business as debtor in possession pursuant to §§ 1107 and 1108 of the Bankruptcy Code.

24.     No request for appointment of a chapter 11 trustee or examiner has been made and, as of the date hereof, no official committee has been appointed.

## SUPPORT FOR FIRST DAY MOTIONS

### Petition

25.     I have reviewed the information in the Debtor's voluntary petition and documents filed in support thereof, and they are true and accurate to the best of my knowledge.

### Cash Management Motion

26.     As of the Petition Date, the Debtor maintains three checking accounts – one at RBS Citizens and two at State Savings Bank. An accurate list of such bank accounts is attached to the Cash Management Motion as Exhibit B. All of these accounts are denominated in U.S. currency, and the Debtor holds no accounts outside of the United States. The Debtor's funds are generally not transferred between its accounts.

27.     The Debtor also maintains a perpetual care trust for its landfill at State Savings Bank.

28.     The Debtor employs various methods to deposit, withdraw, and otherwise transfer funds to, from and between its bank accounts, including checks, automated clearing house transactions, direct deposits and electronic funds transfers. I believe these bank accounts are in a financially stable banking institution with the Federal Deposit Insurance Corporation or other appropriate government-guaranteed deposit protection insurance.

29.     The Debtor's bank accounts are centrally monitored by employees at the Debtor's principal office with funds flowing through such accounts as described in the Cash Management Motion.

30.     Requiring the Debtor to close its existing bank accounts and open new debtor-in-possession accounts would not be in the best interest of the estate, as it would (a) be costly, (b) disrupt the Debtor's ability to satisfy postpetition payables in a timely manner, potentially causing a loss of trade credit and customer confidence, (c) interfere with the efficient management of the Debtor's cash resources, and (d) distract the Debtor's managers at a time when the business requires their full attention.

31.     In the ordinary course of its business, the Debtor uses a variety of checks and other business forms, including purchase orders and invoices. By virtue of the nature and scope of the business in which the Debtor is engaged, and the numerous suppliers of goods and services and other parties with whom the Debtor conducts business, it is imperative that the Debtor be permitted to continue to use such business forms without alteration or change. Changing correspondence and business forms would be unnecessary and burdensome to the estate, as well as expensive and disruptive to the Debtor's business operations.

32.     The Debtor's existing cash management system is beneficial to the Debtor, its estate and its creditors because it enables the Debtor to (i) reduce the administrative expenses involved in moving funds, (ii) maintain accurate information regarding receipts, account balances and disbursements, (iii) maintain an efficient process for the investment of cash, and (iv) ensure compliance with the Debtor's accounting and disbursement control procedures.

33.     The Debtor does not have excess funds which it invests outside of its bank accounts; and its accounts with RBS Citizens earn interest. The Debtor's investments in its bank

accounts are safe, prudent and designed to yield the maximum reasonable return on the funds invested, taking into account the safety of such deposits. The Debtor and its estate will receive significant benefit from the continued investment of excess funds.

## Customer Programs Motion

34.     The Debtor offers rebate and discount programs to its customers (the "Customer Programs"). The Customer Programs are provided for a variety of customer acquisition and maintenance reasons.

35.     The Customer Programs offered by the Debtor vary on a customer-by-customer basis and are part of ordinary and necessary business. The Customer Programs fall into two broad categories. The first category comprises rebates earned by the customers in consideration for volume purchases of the Debtor's products. Through these rebate programs, the customer earns rebates on a monthly or quarterly basis. These rebates are then remitted to the customers via direct check paid on a monthly or quarterly basis. As of the Petition Date the aggregate outstanding rebates accrued, but not yet paid, to customers through rebate programs is approximately $50,000 for monthly rebates and $11,000 for quarterly rebates with approximately $31,000 in additional rebate obligations anticipated to accrue this quarter. The second category comprises discounts negotiated and paid to customers. These discount programs involve deductions from customer accounts receivable, as opposed to actual cash payments by the Debtor. As of the Petition Date the aggregate outstanding discounts accrued, but not yet applied, to customers through the Discount Programs is approximately $66,560.00.

36.     The Debtor's customers are the backbone of its business. The ability to honor and perform its obligations with respect to and continue its Customer Programs is critical to the goodwill with its customers the Debtor has worked hard to establish. Such Customer Programs have allowed the Debtor to develop and sustain a positive reputation in the marketplace for its

products and services. The Debtor's business and, ultimately, the success of the Debtor's proposed restructuring depends largely on maintaining the loyalty of its customer base.

37. Unless the Debtor can take the measures requested in the Customer Programs Motion to alleviate customer concerns, the Debtor believes that the bankruptcy filing itself may have some negative impact on customers' attitudes towards the Debtor's products. In particular, if customers perceive that the Debtor is unable or unwilling to fulfill its prepetition obligations under and/or continue its Customer Programs, the Debtor's goodwill and business relationships may erode. This may reduce the value of the Debtor's current inventory. To prevent any such occurrence, the Debtor desires to honor and perform its prepetition obligations under and continue during the postpetition period those Customer Programs that were beneficial to its business and cost-effective during the prepetition period. Such relief is necessary to preserve the Debtor's critical customer relationships and goodwill, thereby maximizing the value of the Debtor's business and assets for the benefit of the estate.

38. Honoring the existing Customer Programs, in the manner set forth in the Customer Programs Motion, is critical to the Debtor maintaining its operations. In the competitive market in which the Debtor operates, even a short delay by the Debtor in honoring its Customer Programs could cause customers to take their business to the Debtor's competitors, resulting in irreparable harm to the value of its business and assets.

39. The total amount requested to be paid or credited to customers is minimal compared with the losses that the Debtor could suffer if the patronage of its customers erodes at the outset of this case. In sum, the Customer Programs are essential to maintaining the value of the Debtor's business and inventory. Permitting the Debtor to honor and continue its Customer Programs is in the best interests of its estate, its creditors and all other parties in interest.

40. The failure to satisfy Customer Program obligations could have a material adverse impact on the Debtor's operations and the value of the Debtor's business and estate. The uninterrupted maintenance of its Customer Programs is essential to maintaining customer satisfaction and the value of the Debtor's business and assets. The marketplace in which the Debtor operates is highly competitive and its Customer Programs are integral to the Debtor's ability to induce customers to purchase the Debtor's products and services. Discontinuation of its Customer Programs would thus disrupt sale operations and undermine the Debtor's relationships with its customers.

41. Substantial benefits will inure to the estate, creditors and other parties in interest as a result of the Debtor honoring, maintaining and continuing its Customer Programs postpetition and honoring prepetition obligations on account of such programs.

42. Honoring prepetition obligations to customers and continuing Customer Programs is essential to maintaining customer satisfaction. The markets for the Debtor's products are highly competitive, and honoring prepetition obligations to customers and continuing its Customer Programs is integral to the Debtor's ability to induce customers to purchase the Debtor's products and services. Failure to honor prepetition obligations to customers or the discontinuation of the Customer Programs would disrupt business operations and undermine the Debtor's relationships with its customers.

43. The Debtor's Customer Programs are vital to its business operations because these programs are essential to the Debtor's relationship with its customers and the value of its business and assets. Failure to satisfy obligations with respect to the Customer Programs in the ordinary course of business during the first 21 days of this case could cause customers and distributors to take their business to the Debtor's competitors and irreparable harm to the value

of the Debtor's business and assets. Maintaining the Debtor's Customer Programs is necessary to prevent irreparable damage to the Debtor's business operations.

**Wage Motion**

44. As of the Petition Date, the Debtor employs 158 active employees, including 44 salaried employees and 114 hourly Employees, of whom 100 are employed full-time, 12 are employed seasonally and 2 are in the midst of a 90-day probationary period.

45. Prior to the Petition Date, on August 5, 2011, the Debtor issued a notice to its Employees under the Worker Adjustment and Retraining Notification Act. This notice was issued because, on August 4, 2011, the Debtor's lender notified the Debtor that it was terminating the Debtor's use of cash collateral. The Debtor remains in the processing of shutting down its manufacturing operations, but has not yet terminated any employee as a result of the shutdown. Further, the Debtor remains in active negotiations with a number of parties regarding financing which, if obtained, may obviate the need for, or lessen the scope of, the planned significant reduction in force. The Debtor's lender has consented to the use of cash collateral and the payments of prepetition obligations requested in this Motion while the Debtor.

46. The Debtor's payroll payments are administered, processed by and paid through a third-party payroll vendor, ADP Total Source ("ADP"). In addition, ADP handles all the required tax support and garnishment withholdings from the wages, and payment of the employee and employer share payroll taxes to the requisite taxing authority.

47. The combined average monthly payroll for the Debtor's employees is approximately $845,496, with $747,818 allotted to wages and $97,678 allotted to government benefits. ADP processes payroll by withdrawing from the Debtor's operating account the net amount due for the respective payroll period; the Debtor's employees are paid bi-weekly. The last payroll for employees was August 5, 2011, and the next payroll is scheduled for August 19,

2011. As of the Petition Date, the Debtor estimates that approximately $279,890 in earned, but unpaid, salary and wages will be owed to the employees on August 19, 2011, and, based on anticipated cutbacks, an additional $239,140 in salary and wages will be owed to the employees on September 2, 2011.

48.     The Debtor structures its PTO based on (i) the type of employee (salaried versus hourly) and (ii) length of service with the Debtor. PTO accrues weekly. Employees are only compensated for unused PTO upon termination, in which case the employee's unused PTO balance is paid. Otherwise, the employees may use PTO when they take a vacation day. The payment of unused PTO on termination of an employee is handled through payroll by ADP. As of the Petition Date, Debtor's liability for all accrued PTO for all employees is approximately $633,364 if such time were to be paid in cash.

49.     The Debtor's miscellaneous payroll deductions, if any, are handled by ADP.

50.     In the ordinary course of the Debtor's business, employees incur a variety of business expenses that are typically reimbursed by the Debtor, pursuant to the Debtor's normal business practices; these expenses average $13,225 per month. Certain employees have not yet been reimbursed for expenses previously incurred on behalf of the Debtor. All of these reimbursements were incurred with the understanding that they would be reimbursed by the Debtor. As of the Petition Date, the Debtor estimates such expenses have been incurred in the amount of $20,175.30 by employees, but have not yet been reimbursed to those employees.

51.     In the ordinary course of its business, the Debtor provides health, accident, sickness and optional life insurance coverage through the Employee Benefits Association ("EBA"). EBA handles the administration of health and welfare programs services to the individual providers. The Debtor is responsible for certain portions of the benefit premiums and

the employees are responsible for certain portions of the benefit premiums. The Debtor directly pays these premiums to EBA. The average monthly contribution by the Debtor for employee welfare programs is approximately $256,884.

52.  The Debtor and its employees participate in a flexible spending account program.

53.  The Debtor's workers' compensation insurance is purchased and administered by the Accident Fund ("AF"). As of the Petition Date, the total estimated amount owed by Debtor to AF for workers' compensation insurance is approximately $20,494.04, which represents the final workers' compensation insurance premium due for 2011 and will ensure such coverage until November 16, 2011, after which the average monthly obligation for workers' compensation insurance is $17,077.

54.  The Debtor collects contributions from terminated employees and turns over such contributions for the benefit of COBRA insurance coverage. The Debtor makes average monthly contributions to COBRA of $1,074.92.

55.  The Debtor accrues, in the ordinary course of business, union dues. The average monthly union dues total $7,100. As of the Petition Date, approximately $10,317.17 of union dues are accrued and outstanding.

56.  In the ordinary course of its business, the Debtor works with Ascensus to administer a 401(k) retirement plan. The Debtor and its employees each make biweekly contributions to such 401(k) plan, which is managed by Ascensus. The Debtor's biweekly contribution to the 401(k) plan obligation is approximately $57,500.

57.  The Debtor's employee benefits also include such items as maternity leave, jury duty, and a family and medical leave as such policies are required under federal and state guidelines. The amounts owing under these miscellaneous programs are *de minimis*.

58.     The Debtor accrues, in the ordinary course of business, state, federal employment taxes on wages earned by its employees.  These taxes are calculated and withheld by ADP based on statutorily mandated percentages of earned wages.  The Debtor's payroll taxes for the 2010 calendar year, including both employee and employer portions, were approximately $1,141,720.28 for federal income taxes, $362,599.85 for Michigan income taxes, $7,213.13 for Illinois income taxes, $603,210.62 for Social Security taxes, $143,234.03 for Medicare taxes, $11,673.04 for Federal Unemployment Taxes, and $16,391.04 for Michigan Unemployment Taxes.  As of the Petition Date, the Debtor estimates the amount of accrued, outstanding prepetition obligations with respect to its share of payroll taxes to be approximately $237,203.

59.     Employees earn severance pay at a rate of $100 per year of service.  As of the Petition Date, Debtor's liability for all accrued severance obligations is approximately $327,300.

60.     As noted above, the Debtor utilizes ADP, EBA AF, and Ascensus to maintain, administer and provide recordkeeping and other administrative services with respect to its payroll, Health and Welfare Programs, Workers' Compensation Insurance, and 401K Plan, respectively.  ADP charges the Debtor approximately $1,850 per month for its services.  I do not believe there is any prepetition amount outstanding to ADP for its services.  EBA charges the Debtor $1,050 per month for its services.  EBA is owed $3,146 for its prepetition services.  AF does not issue a monthly charge for its services.  I do not believe there is any prepetition amount outstanding to AF for its services. Ascensus does not issue a regular monthly charge for its services.  I do not not believe there is any prepetition amount outstanding to Ascensus for its services.

61.     Payment of employee obligations is part of the ordinary course of business of the Debtor; however, to the extent it is not in the ordinary course, the Debtor submits that such

payments are appropriate in this case. The prepetition employee obligations will preserve and protect the value of the Debtor's business, retain current employees and maintain positive employee morale at this critical juncture.

62.     Most of the prepetition employee obligations constitute priority claims or are obligations that arise in the ordinary course of business postpetition. Payment of such amounts at this time is critical to preserve and protect the value of the Debtor's business, retain current employees and maintain positive employee morale at this critical juncture. Furthermore, to the extent any employee is owed in excess of $11,725 on account of a prepetition claim, payment of such amounts is as critical.

63.     Any delay in paying the prepetition employee obligations will adversely impact the Debtor's relationship with its employees and will irreparably impair its employees' morale, dedication, confidence, and cooperation. Employee support for the Debtor's reorganization efforts is critical to the success of those efforts. At this early stage, the Debtor simply cannot risk the substantial damage to its business that would inevitably attend any decline in its employees' morale attributable to Debtor's failure to pay wages, salaries, benefits and other similar items.

64.     Moreover, absent an order granting the relief requested in the Wage Motion, the Debtor's employees will suffer undue hardship and, in many instances, serious financial difficulties, as the amounts in question are needed to enable certain of the employees to meet their own personal financial obligations. For example, denial of continuation of health benefit coverage will unnecessarily burden sick employees with a potential loss of coverage or reimbursement. Finally, without the requested relief, the stability of the Debtor will be undermined, perhaps irreparably, by the possibility that otherwise loyal employees will seek other employment alternatives with employers whose ability to offer competitive compensation

and benefit programs has not been hindered. Without the cooperation of its employees, the continued reliability and efficiency of the Debtor's ongoing operations pending reorganization would be impossible.

65.     If the Debtor's employee obligations are not paid, the Debtor will be subject to substantial disruption in its reorganization efforts that would result from, among other things, (i) the impairment of Debtor's relationship with its employees, (ii) the diminishment of employee morale, dedication, confidence, and cooperation, and (iii) potential disruptions caused by otherwise loyal employees seeking employment opportunities elsewhere.

## Utilities Motion

66.     In the ordinary course of business, the Debtor regularly incurs utility expenses for electricity, natural gas, water and sewer service, local and long-distance telephone service, waste management services, and internet service. The Debtor's aggregate average monthly cost for utility services is approximately $116,640.00.[1] The utility services are provided by approximately eleven (11) utility companies (the "Utility Providers"), on approximately twenty (20) utility accounts. A true and accurate list of these Utility Providers and related utility accounts is attached as Exhibit A to the Utilities Motion.[2]

67.     As of the Petition Date and as qualified below, the Debtor is generally current on payments to the Utility Providers for utility services. Overall, the Debtor has a long and established payment history with most of the Utility Providers indicating consistent payment for utility services. As of the Petition Date, however, the Debtor may have had (a) prepetition

---

[1] The Debtor's actual historical monthly average is significantly higher than the amount stated in this Declaration and the Utilities Motion because of the energy use associated with operating its paper machine. However, prior to the Petition Date, the Debtor ceased operating its paper machine. Therefore, the monthly average in this Declaration and the Utilities Motion is management's estimate based on a meter reading since cessation of operations and excludes utility charges related to the operation of the Debtor's paper machine.

[2] The entities listed in Exhibit A to the Utilities Motion constitute, to the best of my understanding, utilities under the law. I understand that the Debtor reserves the right to assert that any of the entities now or hereafter listed in Exhibit A to the Utilities Motion are not "utilities" under the law.

accounts payable to certain Utility Providers, (b) outstanding checks issued to certain Utility Providers in payment for prepetition charges for utility services that had not cleared the Debtor's bank account prior to the Petition Date or (c) liabilities for prepetition utility services for which the Debtor had not yet been billed.

68.     Access to utility services is critical to the Debtor's ongoing operations pending reorganization.  Should any Utility Provider refuse or discontinue a utility service even for a brief period of time, the Debtor's operations would be severely disrupted.  Any such disruption would diminish the value of the Debtor's estate.  In this regard, it is in the best interest of the Debtor, its estate and its creditors to maintain continuous and uninterrupted utility services during this chapter 11 case.

69.     The Debtor cannot continue its operations without the continued services of the Utility Providers.  If any of the Utility Providers alter, refuse, or discontinue service, even for a brief period, the Debtor's business operations would be severely disrupted and the value of its estate would be negatively impacted.

### Warehouse Motion

70.     In the ordinary course of its business, the Debtor engages a variety of third party common and other carriers and freight shipment providers in various aspects of its business including, but not limited to, moving recycling materials, pulp, and paper product between plants, warehouse facilities, and customers, as well as transporting the chemicals, packaging, and raw material necessary for the Debtor's operations.  To facilitate efficient and timely shipment and delivery, the Debtor relies upon the services of such shippers.  It is critical to the Debtor's operations and efforts to maximize the value of its estate that it maintains a reliable and efficient transport system to ensure timely shipment and delivery of materials and goods, which will require the continued and uninterrupted services of such shippers.

71.     Any failure by the Debtor to honor its obligations to its shippers will likely have a materially adverse impact on the reliability and efficiency of the current transport system. If such shipper obligations remain unpaid, the Debtor faces the real possibility that certain of its shippers may refuse to continue their respective services.

72.     To avoid any potential interruption or delay in the Debtor's transport system, which interruption or delay will likely have a material adverse impact on the Debtor's operations and efforts to maximize the value of its estate, it is imperative that the Debtor has the ability to satisfy obligations to its shippers in order to maintain the continued and uninterrupted services of the shippers.

73.     Over the past six months, the average aggregate monthly amount of obligations to shippers was approximately $1,043,647.33. As of the Petition Date, the aggregate outstanding amount of obligations to shippers is approximately $920,000.

74.     In the ordinary course of the Debtor's business, the Debtor regularly utilizes the services of third-party warehouses to store goods in transit, which are being shipped to the Debtor's customers and goods that are being processed. Generally, such warehousemen invoice the Debtor on an activity based plus rent basis or use per unit rate basis for their services.

75.     Any failure by the Debtor to honor its obligations to its warehousemen will likely have a materially adverse impact on the reliability and efficiency of the current warehousing and transport system. If warehousemen obligations remain unpaid, the Debtor faces the real possibility that certain of its warehousemen may refuse to continue their respective services.

76.     To avoid any potential interruption or delay in the Debtor's transport system, which interruption or delay will likely have a material adverse impact on the Debtor's operations and efforts to maximize the value of its estate, it is imperative that the Debtor has the ability to

satisfy obligations to its warehousemen in order to maintain the continued and uninterrupted services of such warehousemen.

77.   Over the past six months, the average aggregate monthly amount of obligations to warehousemen was approximately $12,830.50.  As of the Petition Date, the aggregate outstanding amount of obligations to warehousemen is approximately $25,000.00.

78.   In the ordinary course of the Debtor's business, the Debtor sometimes requires the services of third-party service providers that install, repair and/or replace various parts and components essential to the continued and uninterrupted operation of the Debtor's equipment and machinery.  Although the Debtor has the capability to perform certain routine repairs and maintenance, when necessary, the Debtor relies heavily upon these highly-skilled or critically-located parties to provide timely repairs and maintenance to equipment parts and components.  Prior to the Petition Date, these parties performed such services both on-site, as well is in their respective repair shops.  At any given time, the Debtor may have certain critical parts and components in the process of being serviced by such parties; however, no outstanding amounts are owed to such parties as of the Petition Date.

79.   In the event that there are any outstanding obligations to such third-party service providers are not honored, the Debtor faces the real possibility that certain of such parties may refuse to continue their respective services for the Debtor, including repair, maintenance, installation and other servicing obligations—services critical to the reliability and efficiency of the Debtor's operations.  Further, if such parties retain the Debtor's property as a result of outstanding obligations, it would be detrimental to the Debtor's estate not to have an authorized means by which its property could be quickly retrieved without legal action.  Accordingly, it is

imperative that the Debtor have the ability to satisfy all obligations to such parties to the extent discovered by the Debtor.

80.    The Debtor's maintenance of its positive relationships with its shippers, warehousemen and the Shippers, the Warehousemen and third-party service providers is critical to the continued reliability and efficiency of its transport and storage system, as well as its equipment and machinery, and, therefore, to ongoing operations pending the sale of some or all of the Debtor's business and assets and, to the extent necessary, during the transition period thereafter.  The Debtor's ability to maintain continued and uninterrupted operations during this crucial time will in turn serve to maximize value of its estate for the benefit of its estate and creditors.  Accordingly, the Debtor's ability to pay certain prepetition claims of these parties will facilitate a smooth and orderly transition into and sale process during its chapter 11 case.  Additionally, the total amount to be paid to such parties is minimal compared to (a) the importance and necessity of their services to (i) the Debtor's transport and storage system and operations and (ii) maintaining the value of the Debtor's business and assets pending a sale and (b) the losses the Debtor may suffer if that system and those operations were affected.  Moreover, should the Debtor propose an expedited sale process, there would not be any cost-effective and/or readily accessible alternatives to these parties.  Accordingly, permitting the Debtor to honor certain undisputed claims of certain of its shippers, warehousemen and third-party service providers is in the best interests of the Debtor's estate and its creditors.

81.    Payment of the prepetition claims of the Debtor's shippers, warehousemen, and the third-party service providers is essential to the continued supply of goods and services necessary to maintain the Debtor's operations.  Even a minor delay could undermine the Debtor's ability to meet internal schedules or fulfill its customers' purchase needs.  Such

disruptions also would likely cause the Debtor's relationships with its customers to be severely, and possibly irreparably impaired. Any such delay or disruption could jeopardize the Debtor's ability to maximize the value of its estate while it evaluates its strategic options.

82.     As described above, the Debtor's shippers, warehousemen, and third-party service providers are vital to the Debtor's business operations because it performs a variety of functions critical to the shipment, storage, sale and purchase of both the Debtor's raw materials and finished goods and other tasks. Failure to satisfy obligations with respect to these parties in the ordinary course of business during the first twenty days after the Petition Date will jeopardize the loyalty and trust of such parties. Certain of these parties may refrain from performing the tasks that they performed prior to the Petition Date and thereby cause serious disruption to the Debtor's business operations during this critical period. Any such disruption would likely have a material adverse effect on the value of the Debtor's business and assets while they evaluate its strategic options.

### Cash Collateral Motion

83.     The Debtor is indebted to RBS Citizens pursuant to a Credit Agreement between Debtor and RBS Citizens dated November 16, 2006 in the approximate amount of $11.1 million, as of the Petition Date. In consideration of RBS Citizens' advances under the Credit Agreement, the Debtor granted RBS Citizens a security interest in all of its assets.

84.     Debtor is indebted to Merit Mezzanine Fund IV, L.P., a Delaware limited partnership, and Merit Mezzanine Parallel Fund IV, L.P., a Delaware limited partnership (collectively, "Merit"), pursuant to subordinated notes in the original principal amount of $16 million. As the result of subsequent advances to the Debtor by Merit, as of the Petition Date, the Merit debt, including accrued interest, totals approximately $33 million.

85. In addition to the foregoing, as of the Petition Date, the Debtor had approximately $13.3 million in unpaid accounts payable, $400,000 in long-term environmental liabilities, and $850,000 in management fees allegedly due to Remark.

86. The Debtor requires immediate access to Cash Collateral (as defined in the Cash Collateral Motion) to permit, among other things, the orderly continuation of the operation of its businesses, to maintain business relationships with vendors, suppliers and customers, to make payroll, to make immediately necessary capital expenditures, to pay the costs of administration of its estate and to satisfy other working capital and operational needs.

87. The Debtor does not have sufficient available sources of cash to carry on the operation of its business without the use of the Cash Collateral. The Debtor's ability to maintain business relationships with its vendors, suppliers and customers, to pay its employees and otherwise finance its operations is essential to the Debtor's continued viability and prospects for an orderly sale of substantially of its assets.

88. The Debtor's access to sufficient working capital and liquidity through the use of Cash Collateral, and other financial accommodations is vital to the preservation and maintenance of value of its estate pending the sale process. Without continued and uninterrupted access to Cash Collateral, the Debtor will not be able to operate its business at all, and the Debtor, its estate, and creditors would suffer serious and likely irreparable harm. Preserving, maintaining, and enhancing the value of the Debtor's business and assets is of the utmost importance to a successful sale.

89. I believe the Cash Collateral arrangement set forth in the Cash Collateral Motion is fair and reasonable.

90.     RBS Citizens has consented to the Debtor's use of Cash Collateral.  Accordingly, I believe that the terms of the Cash Collateral arrangement discussed in the Cash Collateral Motion, including the grant of adequate protection and other rights and protections granted to RBS Citizens, constitute adequate protection of RBS Citizens' interest in the Cash Collateral.

91.     If the relief requested in the Cash Collateral Motion is granted, the Debtor will have working capital to operate its business to the extent necessary to preserve and maximize value of its business, thereby maintaining and maximizing value for the benefit of stakeholders.

92.     The Debtor's use of Cash Collateral on the terms discussed in the Cash Collateral Motion is in the best interest of the Debtor, its estate, its creditors, and parties in interest.


        I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct.


        Executed this 12th day of August, 2011, at Manistique, Michigan.

                                        _____
                                        Jon Johnson