## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

|  |  |
|---|---|
| In re | Chapter 11 |
| MANISTIQUE PAPERS, INC., | Case No. 11-12562 (KJC) |
| Debtor.[1] | <u>Requested Hearing Date:</u><br>**September 28, 2011, at 2:30 p.m. (ET)**<br><u>Requested Objection Deadline:</u><br>**September 27, 2011, at 12:00 p.m. (ET)** |

**DEBTOR'S MOTION FOR THE ENTRY OF INTERIM AND FINAL ORDERS
(A) AUTHORIZING AND APPROVING DEBTOR-IN-POSSESSION FINANCING
PURSUANT TO SECTIONS 105, 361, 362, 363, AND 364 OF THE BANKRUPTCY
CODE, BANKRUPTCY RULES 2002 AND 4001, AND LOCAL RULE 4001-2, (B)
MODIFYING THE AUTOMATIC STAY UNDER SECTION 362 OF THE
BANKRUPTCY CODE, AND (C) SCHEDULING A FINAL HEARING AND
<u>APPROVING FORM AND MANNER OF NOTICE THEREOF</u>**

The above-captioned debtor and debtor in possession (the "Debtor") hereby

moves (the "Motion") for the entry of interim and final orders, pursuant to sections 105, 361,

362, 363, and 364 of chapter 11 of title 11 of the United States Code (the "Bankruptcy Code"),

Rules 2002 and 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules")

and Rule 4001-2 of the Local Rules of Bankruptcy Practice and Procedure for the United States

Bankruptcy Court for the District of Delaware (the "Local Rules"), (a) authorizing and approving

debtor-in-possession financing pursuant to that certain Debtor-in-Possession Credit Agreement

(the "DIP Credit Agreement") with mBank (with participation by the Michigan Strategic Fund)

(together, the "DIP Lender"), (b) modifying the automatic stay under section 362 of the

Bankruptcy Code, and (c) scheduling a final hearing and approving the form and manner of

notice thereof, pursuant to Rule 4001(b) of the Federal Rules of Bankruptcy Procedure (the

---

[1]    The Debtor's federal tax identification number is 65-1290950. The Debtor's mailing address and
corporate headquarters is 453 South Mackinac Avenue, Manistique, MI 49854-1399.

"Bankruptcy Rules"). In support of this Motion, the Debtor relies on and incorporates by reference the *Declaration Of Jon Johnson In Support Of The Debtor's Chapter 11 Petition And First Day Motions* (D.I. 2) (the "First Day Declaration"), filed on August 12, 2011, and the *Declaration of Jon Johnson in Support Of Debtor's Motion For The Entry Of Interim And Final Orders (A) Authorizing And Approving Debtor-In-Possession Financing Pursuant To Sections 105, 361, 362, 363, And 364 Of The Bankruptcy Code Bankruptcy Rules 2002 And 4001, And Local Rule 4001-2, (B) Modifying The Automatic Stay Under Section 362 Of The Bankruptcy Code, And (C) Scheduling A Final Hearing And Approving Form And Manner Of Notice Thereof* (the "DIP Declaration"), attached hereto as **Exhibit B**, and respectfully represents as follows:

## JURISDICTION

1.      The Court has jurisdiction over the Motion pursuant to 28 U.S.C. §§ 157 and 1334. This is a core proceeding within the meaning of 28 U.S.C. § 157(b)(2). Venue of this case and the Motion in this Court is proper under 28 U.S.C. §§ 1408 and 1409.

2.      The statutory bases for the relief requested herein are sections 105, 361, 362, 363, and 364 of the Bankruptcy Code, as supplemented by Bankruptcy Rules 2002, 4001, and 9014, and Rule 4001-2 of the Local Rules for the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## RELIEF REQUESTED

3.      By this Motion, the Debtor respectfully requests the entry of interim and final orders (a) authorizing and approving the Debtor's entry into the DIP Credit Agreement, (b) modifying the automatic stay, and (c) scheduling a final hearing and approving the form and

manner of notice thereof. Pursuant to Bankruptcy Rule 4001(c)(1)(B), the Debtor highlights the following aspects of the relief requested:[2]

- authorization for the Debtor to enter into a first priority senior secured multiple draw term credit facility (the "DIP Facility") in an aggregate principal amount of $5,000,000, bearing an interest rate of The Wall Street Journal Prime Rate, plus 1.00%;

- authorization to grant to the DIP Lender, on account of the DIP Facility, (i) postpetition first priority liens on unencumbered assets of the Debtor, (ii) priming liens on collateral securing the Prepetition Loan (which is held by the DIP Lender), and (iii) superpriority administrative expense claims;

- authorization for the DIP Lender to exercise remedies upon the occurrence and continuance of an Event of Default, including, without limitation, upon the entry of an order or orders granting relief from the automatic stay applicable under section 362 of the Bankruptcy Code;

- to schedule, pursuant to Bankruptcy Rule 4001, a final hearing (the "Final Hearing") for this Court to consider entry of a final order (the "Final Order") authorizing the Debtor, on a final basis, to borrow under the DIP Facility the balance of the DIP Loans and authorizing and approving, on a final basis, the relief requested in the Motion; and

- authorization for the Debtor to execute and deliver final documentation consistent with the DIP Credit Agreement and to perform such other and further acts as may be necessary or appropriate in connection therewith, which final documents shall include without limitation (a) the DIP Credit Agreement among the Debtor and the DIP Lender and (b) other agreements, documents, and instruments delivered or executed in connection with the DIP Credit Agreement, all of which shall be in form and substance acceptable to the DIP Lender (such documentation, the "DIP Documents").

## GENERAL BACKGROUND

4.     On August 12, 2011 (the "Petition Date"), the Debtor commenced this bankruptcy case (the "Case") by filing a voluntary petition for relief under chapter 11 of the Bankruptcy Code. No trustee or examiner has been appointed in this case. The Debtor is

---

[2]     Capitalized but undefined terms used in this summary of relief requested are defined below.

operating its businesses as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

5.     On August 23, 2011, the Office of the United States Trustee for the District of Delaware ("U.S. Trustee") appointed an official committee of unsecured creditors (the "Committee") in this case (D.I. 58).

6.     An overview of the Debtor's business operations, capital structure, and the circumstances leading to this chapter 11 case is set forth in the First Day Declaration.

## PROCEDURAL BACKGROUND

7.     On the Petition Date, the Debtor filed the *Debtor's Motion for the Entry of Interim and Final Orders Pursuant to Sections 105, 361, 362, and 363 of the Bankruptcy Code (I) Authorizing Debtor to Use Cash Collateral; (II) Granting Adequate Protection to the Debtor's Prepetition Secured Lender and (C) Scheduling a Final Hearing* (D.I. 10) (the "Cash Collateral Motion").

8.     On August 15, 2011, the Court entered the *Interim Order Authorizing Debtor To: (A) Use Cash Collateral on an Emergency Basis; and (B) Grant Adequate Protection and Other Relief to RBS Citizens, National Association* (D.I. 25) (the "First Interim Order").

9.     On August 25, 2011, the Court entered the *Second Interim Order Authorizing Debtor To: (A) Use Cash Collateral on an Emergency Basis; and (B) Grant Adequate Protection and Other Relief to RBS Citizens, National Association* [*sic*] (D.I. 73), which authorized the Debtor to use cash collateral of mBank through and including September 15, 2011.

10. On September 15, 2011, the Court entered the *Final Order Authorizing Debtor to: Use Cash Collateral and Grant Adequate Protection and Other Relief to mBank* (D.I. 140) (the "Final Cash Collateral Order").

## THE DEBTOR'S PREPETITION DEBT STRUCTURE

11. As of the Petition Date, the Debtor was indebted to RBS Citizens, National Association ("RBS Citizens"), pursuant to a Credit Agreement between the Debtor and RBS Citizens dated November 16, 2006, in the approximate amount of $11.1 million (the "Prepetition Loan"). In consideration of RBS Citizens' advances under the Credit Agreement, the Debtor granted RBS Citizens a security interest in all of its assets.

12. On August 24, 2011, mBank purchased the secured position of RBS Citizens under the Prepetition Loan and is now Debtor's prepetition lender (the "Prepetition Lender") in place of RBS Citizens.

13. The Debtor is indebted to Merit Mezzanine Fund IV, L.P., a Delaware limited partnership, and Merit Mezzanine Parallel Fund IV, L.P., a Delaware limited partnership (collectively, "Merit"), pursuant to subordinated notes in the original principal amount of $16 million. As the result of subsequent advances to the Debtor by Merit, as of the Petition Date, the Merit debt, including accrued interest, totals approximately $33 million.

14. In addition to the foregoing, as of the Petition Date, the Debtor had approximately $13.3 million in unpaid accounts payable, $400,000 in long-term environmental liabilities, and $850,000 in management fees allegedly due to Remark Paper Co., Inc.

## THE DEBTOR'S URGENT NEED FOR DEBTOR-IN-POSSESSION FINANCING

15. As described in the First Day Declaration, the Cash Collateral Motion, and the DIP Declaration, the Debtor ceased manufacturing operations when RBS Citizens cut off the

Debtor's use of Cash Collateral prior to the Petition Date. While the First Interim Order authorized use of the Cash Collateral of RBS Citizens, it was insufficient to allow the Debtor to continue to operate for more than a few weeks. In fact, RBS Citizens filed a motion to convert this chapter 11 case to a case under chapter 7 of the Bankruptcy Code on August 17, 2011 (D.I. 45), which was scheduled to be heard at the same August 25th hearing on further interim approval of the use of Cash Collateral.

16.     Accordingly, beginning before the Petition Date and continuing thereafter, the Debtor and its representatives conducted a search for additional financing sufficient, initially, to prevent conversion of the case to chapter 7, and, eventually, to fund a restart of the Debtor's manufacturing operations. These efforts were successful and resulted in mBank, a Michigan-chartered bank based in Manistique, Michigan, buying out the secured position of RBS Citizens. mBank is now the Debtor's Prepetition Lender in place of RBS Citizens.

17.     mBank agreed to allow the Debtor to continue to use its Cash Collateral on a consensual basis, which is reflected in the Final Cash Collateral Order. But while the use of Cash Collateral provides sufficient access to capital to restart the Debtor's manufacturing operations, it is insufficient to provide for continued operations and administration this chapter 11 case pending a sale or other restructuring transaction. Therefore, the Debtor and its professionals sought additional financing from mBank and others.

18.     As a result of the Debtor's efforts, mBank, with participation by the State of Michigan's Michigan Strategic Fund (the "MSF"), has agreed to provide the DIP Facility on extremely favorable terms to the Debtor.

19.     Access to the DIP Facility is essential to maintaining and maximizing the value of the Debtor's estate. The Debtor requires immediate access to the DIP Facility to permit the Debtor to continue the operation of its business after manufacturing operations recommence. The DIP Facility will also enable the Debtor to maintain business relationships with vendors, suppliers, and customers; to make payroll; to make immediately necessary capital expenditures; to pay the costs of administration of its estate; and to satisfy other working capital and operational needs.

20.     Without the DIP Facility, the Debtor does not have access to sufficient capital to operate. The Debtor has already been "dark" for approximately one month. The Debtor's ability to maintain business relationships with its vendors, suppliers, and customers; to pay its employees; and otherwise maintain the ability to operate all depend critically on resuming operations as soon as possible.

21.     If the Debtor is unable to resume and continue manufacturing operations, the value of the Debtor's business and assets will remain impaired. The Debtor's access to sufficient working capital and liquidity through the DIP Facility is vital to the preservation and maintenance of the value of its estate pending a sale process. Without access to the DIP Facility, the Debtor will not be able to operate its business at all, and the Debtor, its estate, and creditors would suffer serious and likely irreparable harm. Preserving, maintaining, and enhancing the value of the Debtor's business and assets is of the utmost importance to maximizing value.

22.     As of September 19, 2011, the Debtor has recommenced paper production, but it cannot continue production for any meaningful period without borrowing additional funds from mBank and the MSF.

23. For all of these reasons, the Debtor believes that approval of the DIP Facility set forth herein is fair and reasonable and reflects the Debtor's prudent exercise of its business judgment consistent with its fiduciary duties.

## THE DIP FINANCING

24. Pursuant to 11 U.S.C. §§ 364(c)(1), 364(c)(2), and 364(c)(3), the Debtor requests authority to borrow funds from the DIP Lender. The Debtor has received a commitment from the DIP Lender to loan up to an aggregate principal amount of $5 million pursuant to the terms of the DIP Credit Agreement attached to the proposed Interim Order as Exhibit A.

25. The Debtor has agreed, subject to this Court's approval, to the conditions under which the DIP Lender has agreed to loan funds on a postpetition basis. The principal terms of the DIP Facility are as follows:

| | |
|---|---|
| Borrower: | The Debtor |
| DIP Lender: | mBank (with participation by Michigan Strategic Fund (the "MSF"), a public body corporate and politic within the department of Treasury of the State of Michigan) |
| DIP Facility Amount: | A first priority senior secured multiple draw term credit facility in an aggregate principal amount of $5,000,000. |
| | Upon entry of the Interim Order, the Debtor shall be entitled to borrow up to $2,000,000 under the DIP Facility. |
| | Upon entry of the Final Order, the Debtor shall be entitled to borrow all amounts available under the DIP Facility. |
| Purposes: | To provide working capital and for other general corporate purposes of the Debtor solely in accordance with the Budget (as defined below). The Budget will be designed to implement a sale or restructuring process, as more particularly described below (including professional and administrative fees and expenses associated with the Case for attorneys and professionals hired in connection with the sale process). |
| Budget: | A detailed weekly budget covering the succeeding 15-week period, in form and substance satisfactory to the DIP Lender (with such supporting |

detail as the DIP Lender or its financial advisors may request), shall be provided to the DIP Lender, such budget to be updated commencing with the first week following the closing date for the DIP Facility, for each rolling 15-week period commencing on the date such updated budget is delivered (initial budget, together with all updates thereto, the "Budget"). Each Budget shall be accompanied by a variance analysis with respect to all items from the most recently delivered Budget. Each weekly Budget and all variances from prior Budgets shall be acceptable to the DIP Lender.

Security:
First and priming lien on all assets, including, without limitation, a pledge of the equity in those assets that are subject to liens granted pursuant to the prepetition Loan Documents; pledge of $700,000 from individual Pledgors (as defined in the Interim Order); mortgage on the Debtor's 477 undeveloped property in Hiawatha Township, Schoolcraft County, Michigan; assignment of Debtor's ownership pledge in COOP (a chemical company). Pursuant to 11 U.S.C. § 364(c)(1), the DIP obligations shall be entitled to superpriority claim status in this case.

Interest Rates and Terms:
The DIP Facility will bear an interest rate of Wall Street Journal Prime Rate, plus 1.00%, subject to a floor of 4.25%, payable on the 27th day of each calendar month (or, if such day is not a Business Day, the immediately succeeding Business Day) occurring after the date of the DIP Credit Agreement, commencing on September 27, 2011.

Fees:
Closing fee - $50,000 (Phase 1) due at Closing.

Annual fee - $50,000 (Phase 2) due one year from Closing.

Borrowing Base:
Based upon a percentage of eligible accounts receivable and inventory.

Maturity Date:
December 27, 2011, unless otherwise agreed by Debtor and DIP Lender.

Affirmative Covenants:
The DIP Credit Agreement contains affirmative covenants as are usual and customary for financings of this kind. The affirmative covenants are found at Article 6 of the DIP Credit Agreement.

Negative Covenants:
The DIP Credit Agreement contains negative covenants as are usual and customary for financings of this kind. The negative covenants are found at Article 7 of the DIP Credit Agreement.

Sale Process:
No later than October 15, 2011, Debtor will determine whether to pursue a sale or plan process. The DIP Lender is to receive all information with respect to the sale process substantially concurrently with the Debtor and

its advisors' receipt of such information. In the event the Debtor determines to sell substantially all of its assets, the Debtor shall perform each of the actions set forth below within the time periods provided below (or else trigger an Event of Default):

(a)    On or before October 31, 2011, file a sale and bid procedures motion, in form and substance satisfactory to the DIP Lender in its sole discretion;

(b)    On or before November 10, 2011, obtain entry from the Bankruptcy Court of an order approving bid procedures in form and substance satisfactory to the DIP Lender in its sole discretion, setting forth a bid deadline of December 12, 2011;

(c)    On or before December 15, 2011, conduct an auction, if necessary;

(d)    On or before December 20, 2011, obtain entry of an order of the Bankruptcy Court approving the sale in form and substance satisfactory to the DIP Lender in its sole discretion; and

(e)    On or before December 23, 2011, consummate such sale.

**Application of Proceeds:** Net cash proceeds from asset sales to be applied first to prepay outstanding DIP loans. Any remaining net cash proceeds will be applied to repay the prepetition obligations in accordance with the provisions of the Pre-Petition Credit Agreement. The DIP Facility Amount will be reduced, permanently and on a dollar-for-dollar basis, by the amount of net cash proceeds applied to prepay the DIP Loans.

**Conditions Precedent:** The DIP Credit Agreement contains conditions precedent for the extension of credit as usual and customary for financings of this kind.

**Representations and Warranties:** The DIP Credit Agreement contains representations and warranties as are usual and customary for financings of this kind.

**Events of Default:** The Events of Default listed in Section 10.1 of the DIP Credit Agreement.

**Remedies:** The DIP Lender shall be entitled to the remedies set forth in Section 10.2 of the DIP Credit Agreement, and elsewhere in the DIP Credit Agreement, the Interim Order or the Final Order.

**Right to Credit Bid:** The DIP Lender's rights to credit bid under section 363 of the Bankruptcy Code or pursuant to a chapter 11 plan shall be expressly reserved.

**Fee Reimbursement:** The DIP Lender shall be entitled to reimbursement of the reasonable fees and expenses of its outside counsel or other outside professionals, arising from or related to the DIP Facility or the Case.

26.     These provisions, as well as the other financing provisions reflected in the Financing Order, are the result of good faith, arm's-length negotiations between the Debtor and the DIP Lender.  Accordingly, the Debtor believes that (i) the terms and provisions of the DIP Facility are fair and reasonable under the circumstances and reflect the most favorable terms upon which the Debtor could obtain necessary postpetition financing, and (ii) the DIP Lender is entitled to the protections afforded under 11 U.S.C. § 364(e).

27.     The Debtor is unable to obtain general unsecured credit allowable as an administrative expense under 11 U.S.C. § 503(b)(1).  Moreover, it has almost no unencumbered assets.  In light of these circumstances, the Debtor believes that it is unable to obtain an alternative postpetition credit facility that would suit its needs.  A search for such alternatives would be impracticable and an improvident use of the Debtor's limited resources. *See* DIP Declaration ¶ 13.

28.     Pending a final hearing on this Motion, the Debtor requires and requests the authority to borrow under the DIP Facility, on an interim basis, to fund the Budget.  The Debtor's proposed interim borrowing under the DIP Facility is necessary to maintain the value of the Debtor's assets and thereby eliminate any immediate or irreparable harm that would otherwise threaten value.

29.     Pursuant to Local Rule 4001-2(a)(i), the following is a concise statement terms of the proposed  Order, a copy of which is attached hereto as **Exhibit A**, implicated by such Local Rule, and the justification for each:

| Local Rule Subsection | Location of Language Implicated and Justification |
|---|---|
| *Local Rule 4001-2(a)(i)(A)* requires the disclosure of provisions that grant cross- | The DIP Credit Agreement and the Interim Order do not provide for cross- |

| | |
|---|---|
| collateralization protection (other than replacement liens or other adequate protection) to prepetition secured creditors. | collateralization, except that the DIP Lender will have replacement/priming liens on all of its prepetition collateral, new liens on any unencumbered assets of the Debtor, and junior liens on all assets of the Debtor that are the subject of other valid, perfected security interests. Therefore, the Debtor believes that this provision of the Local Rule is not implicated. |
| *Local Rule 4001-2(a)(i)(B)* requires the disclosure of provisions or findings of fact that bind the estate or other parties in interest with respect to the validity, perfection or amount of the secured creditor's prepetition lien or the waiver of claims against the secured creditor without first giving parties in interest at least seventy-five (75) days from the entry of the order and the creditors' committee, if formed, at least sixty (60) days from the date of its formation to investigate such matters | The DIP Credit Agreement and the Interim Order do not seek to limit the investigation or challenge rights of any party. However, the Final Cash Collateral Order provides that there shall be an "Investigation Period :(a) For any Committee, if formed, the period commencing on the Filing Date and ending on the date that is sixty (60) days after such initial formation, and (b) for any other party in interest (other than Debtor), the period commencing on the Filing Date and ending on the date that is seventy-five (75) days after the Filing Date." <br><br> The Debtor believes the Investigation Period is consistent with the Local Rule. |
| *Local Rule 4001-2(a)(i)(C)* requires the disclosure of provisions that seek to waive, without notice, whatever rights the estate may have under section 506(c) of the Bankruptcy Code. | Paragraph 9 of the Interim Order provides, among other things, that "no costs or expenses of administration of the Chapter 11 Case or any future proceeding that may result therefrom, including liquidation in bankruptcy or other proceedings under the Bankruptcy Code, shall be charged against or recovered from the DIP Collateral pursuant to section 506(c) of the Bankruptcy Code or any similar principle of law, without the prior written consent of the DIP Lender." <br><br> This provision is justified and appropriate because the DIP Lender is funding a "Carve-out" for allowed fees and expenses of the Debtor's and the Committee's professionals through an Event of Default. Post-Event of Default, the DIP Credit Agreement provides $20,000 for "allowed, accrued, but unpaid |

| | |
|---|---|
| | professional fees and expenses of Borrower and Committee incurred in the Chapter 11 Case after a conversion of the Chapter 11 Case to one under chapter 7 of the Bankruptcy Code." |
| *Local Rule 4001-2(a)(i)(D)* requires the disclosure of provisions that immediately grant to the prepetition secured creditor liens on the debtor's claims and causes of action arising under sections 544, 545, 547, 548, and 549 of the Bankruptcy Code. | Subject to the entry of the Final Order, the DIP Lender shall be granted liens on all proceeds of all of the Debtor's claims and causes of action arising under state or federal law under sections 502(d), 541, 542, 544, 545, 547, 548, 549, 550, 551, 552 and 553 of the Bankruptcy Code. *See* Interim Order, ¶¶ 5 & 6.<br><br>The Debtor believes that this provision is justified because the funds provided under the DIP Facility are in the nature of "new money" extended. The Debtor has little to no unencumbered assets—other than the avoidance actions—to offer as collateral for the DIP Facility.<br><br>Moreover, the DIP Facility will be paid first from any proceeds of any sale, and thus the Debtor believes that these actions will be available for the benefit of the Debtor's unsecured creditors regardless of these liens. |
| *Local Rule 4001-2(a)(i)(E)* requires the disclosure of provisions that deem prepetition secured debt to be postpetition debt or that use postpetition loans from a prepetition secured creditor to pay part or all of that secured creditor's prepetition debt, other than as provided in 11 U.S.C. § 552(b). | This provision is not implicated by the Interim Order or the DIP Credit Agreement. Cash swept from the Debtor's accounts pursuant to the DIP Credit Agreement will only be applied to amounts owing under the DIP Facility, not the Prepetition Loan. |
| *Local Rule 4001-2(a)(i)(F)* requires the disclosure of provisions that provide disparate treatment for the professionals retained by a creditors' committee from those professionals retained by the debtor with respect to a professional fee carve-out. | Payment of the professional fees for the Debtor and the Committee prior to the occurrence of an Event of Default will be subject to the Budget estimated to pay all allowed fees and expenses reasonably expected to be incurred in a case of this size and complexity. Following an Event of Default, professionals of the Debtor and the Committee would share in a $20,000 Carve-out. For these reasons, the |

| | Debtor does not believe that this rule is implicated. |
|---|---|
| *Local Rule 4001-2(a)(i)(G)* requires the disclosure of provisions that prime any secured lien without the consent of that lienor. | Pursuant to paragraph 6 of the Interim Order, no liens are primed without the consent of the applicable lienor. |

## BASIS FOR RELIEF REQUESTED

### A.  The Requested Relief Should Be Granted Pursuant to Sections 364(c) and 364(d)(1) of the Bankruptcy Code

30.    As set forth above, the Debtor's ability to maximize the value of its estate and restart operation hinges upon its being able to access postpetition financing.  Section 364 of the Bankruptcy Code distinguishes among (a) obtaining unsecured credit in the ordinary course of business, (b) obtaining unsecured credit outside the ordinary course of business and (c) obtaining credit with specialized priority or on a secured basis.  Pursuant to section 364(c) of the Bankruptcy Code, if a debtor cannot obtain postpetition credit on an unsecured basis, a court may authorize such debtor to obtain credit or incur debt that is entitled to super-priority administrative expense status, secured by a senior lien on unencumbered property or secured by a junior lien on encumbered property.  11 U.S.C. § 364(c).

31.    Under section 364 of the Bankruptcy Code, courts also may authorize postpetition credit secured by a senior or equal lien on encumbered property if the debtor cannot obtain credit elsewhere and the interests of existing lienholders are adequately protected.  See 11 U.S.C. § 364(d)(1).

32.    Specifically, section 364(d)(1) of the Bankruptcy Code provides, in relevant part, that a court may, after notice and a hearing:

> authorize the obtaining of credit or the incurring of debt secured by a senior or equal lien on property of the estate that is subject to a lien only if—

(A)  the [debtor] is unable to obtain credit otherwise; and

(B)  there is adequate protection of the interest of the holder of the lien on the property of the estate on which such senior or equal lien is proposed to be granted.

11 U.S.C. § 364(d)(1).

33.    The focus of a bankruptcy court's approval of a financing agreement pursuant to section 364 should be whether the transaction would enhance the value of the debtor's assets.    Courts advocate using a "holistic approach" to evaluate super-priority postpetition financing agreements that focuses on the transaction as a whole, not just on the priming of liens. *See In re Aqua Assocs.*, 123 B.R. 192, 196 (Bankr. E.D. Pa 1991) ("Obtaining credit should be permitted not only because it is not available elsewhere, which could suggest the unsoundness of the basis for use of the funds generated by credit, but also because the credit acquired is of significant benefit to the debtor's estate and that the terms of the proposed loan are within the bounds of reason, irrespective of the inability of the debtor to obtain comparable credit elsewhere.").

34.    In furtherance of this approach, courts consider a number of factors, including, without limitation:  (a) whether alternative financing is available on any other basis (*e.g.*, whether any better offers, bids or timely proposals are before the court); (b) whether the proposed financing is necessary to preserve estate assets and is necessary, essential and appropriate for continued operation of the debtor's business; (c) whether the terms of the proposed financing are reasonable and adequate given the circumstances of both the debtor and the proposed lender; (d) whether the proposed financing agreement adequately protects prepetition secured creditors; and (e) whether the proposed financing agreement was negotiated in good faith and at arm's length and entry thereto is an exercise of sound and reasonable business judgment and in the best interest of the debtor's estate and its creditors. *See In re Aqua*

*Assocs.*, 123 B.R. 192 (Bankr. E.D. Pa 1991); *In re Crouse Group, Inc.*, 71 B.R. 544 (Bankr. E.D. Pa. 1987); *Bland v. Farmworker Creds.*, 308 B.R. 109, 113–14 (S.D. Ga. 2003). Each of these considerations has been met here.

1. **The DIP Credit Facility Represents the Best Financing Available and Should be Approved**

35.     A debtor seeking financing under section 364(c) of the Bankruptcy Code must make a reasonable effort to seek other sources of unsecured credit, but is granted deference in acting in accordance with its business judgment and, indeed, is not required to seek credit from every possible source. *See, e.g., In re Ames Dep't Stores, Inc.*, 115 B.R. 34, 40 (Bankr. S.D.N.Y. 1990); *see also Bray v. Shenandoah Fed. Sav. & Loan Assoc. (In re Snowshoe Co.)*, 789 F.2d 1085, 1088 (4th Cir. 1986) ("[T]he statute imposes no duty to seek credit from every possible lender before concluding that such credit is unavailable").

36.     Moreover, where few lenders likely can or will extend the necessary credit to a debtor, "it would be unrealistic and unnecessary to require [the debtor] to conduct such an exhaustive search for financing." *In re Sky Valley, Inc.*, 100 B.R. 107, 113 (Bankr. N.D. Ga. 1988); *In re Ames Dep't Stores*, 115 B.R. at 37–39 (debtor must show that it made reasonable efforts to seek other sources of financing under section 364(a) and (b)).

37.     As discussed in the First Day Declaration and the DIP Declaration, the Debtor has been in a liquidity crisis since approximately January 2011, and has sought financing and other sources of capital through its liquidity crisis. *See* DIP Declaration ¶ 7. Notwithstanding these efforts, the Debtor was not able to obtain alternative financing prior to the Petition Date, and, since the Petition Date, the DIP Lender is the only source of financing or capital willing and able to provide financing to the Debtor on reasonable terms and at an amount sufficient to allow the Debtor to continue its operations. *See* DIP Declaration ¶¶ 7, 12, 13.

Therefore, the Debtor believes that the DIP Facility from the DIP Lender represents the best—and perhaps only—possible financing available to the Debtor. *See* DIP Declaration ¶ 12.

### 2. The DIP Credit Facility Is Necessary to Preserve the Assets of the Debtor's Estate

38.     As debtor in possession, the Debtor has a fiduciary duty to protect and maximize the estate's assets. *See In re Mushroom Transp. Co., Inc.*, 382 F.3d 325, 339 (3d Cir. 2004); *Official Comm. of Unsecured Creditors of Cybergenics Corp. v. Chinery*, 330 F.3d 548, 573 (3d Cir. 2003). The DIP Facility, if approved, will provide essential working capital, allowing the Debtor to restart and continue operations in the ordinary course during its bankruptcy case pending a sale or other restructuring transaction. *See* DIP Declaration ¶ 11. Without the DIP Facility, the Debtor will be unable to preserve the going-concern value of its estate or continue operating, thereby endangering the success of this chapter 11 case. *See* DIP Declaration ¶ 15.

39.     Accordingly, the DIP Facility is necessary to preserve the assets and value of the Debtor's estate.

### 3. The Terms of the DIP Documents Are Fair, Reasonable, and Adequate Under the Circumstances

40.     In considering whether the terms of postpetition financing are fair and reasonable, courts consider the terms in light of the relative circumstances of both the debtor and the potential lender. *See In re Farmland Indus., Inc.*, 294 B.R. 855, 886 (Bankr. W.D. Mo. 2003); *see also Unsecured Creditors' Comm. Mobil Oil Corp. v. First Nat'l Bank & Trust Co. (In re Ellingsen MacLean Oil Co.)*, 65 B.R. 358, 365 (W.D. Mich. 1986) (a debtor may have to enter into hard bargains to acquire funds). The appropriateness of a proposed financing facility should also be considered in light of current market conditions.

41. The DIP Facility was negotiated in good faith and at arm's-length among the Debtor and the DIP Lender. *See* DIP Declaration ¶ 16. Given the Debtor's urgent need to obtain financial and operational stability for the benefit of all parties in interest, the terms of the proposed DIP Facility are the best available. *See* DIP Declaration ¶ 12. Indeed, when viewed in its totality, the DIP Facility reflects the Debtor's exercise of prudent business judgment consistent with its fiduciary duties and supported by fair consideration.

42. In addition, the proposed Order and DIP Facility provide that the security interests and administrative expense claims granted to the DIP Lender are subject to the Carve-Out. In *In re Ames Dep't Stores*, 115 B.R. 34 (Bankr. S.D.N.Y. 1990), the court found that such "carve-outs" are not only reasonable, but are necessary to ensure that official committees and the debtor's estate will be assured of the assistance of counsel. *Id.* at 40.

### 4. The Debtor's Proposed Adequate Protection Is Appropriate

43. To the extent a secured creditor's interest in the collateral constitutes a valid and perfected security interest and lien as of the Petition Date, section 364(d)(1)(B) of the Bankruptcy Code requires that adequate protection be provided where the liens of such secured creditor are being primed to secure the obligations under a debtor-in-possession financing facility. *See* 11 U.S.C. § 364(d)(1)(B). Section 361 of the Bankruptcy Code delineates the forms of adequate protection, which include periodic cash payments, additional liens, replacement liens and other forms of relief. *See In re O'Connor*, 808 F.2d 1393, 1396 (10th Cir. 1987); *In re Martin*, 761 F.2d 472 (8th Cir. 1985). The focus of the requirement is to protect a secured creditor from the diminution in value of its interest in the particular collateral during the period of use. *See In re Swedeland Dev. Group, Inc.*, 16 F.3d 552, 564 (3d Cir. 1994) ("The whole purpose of adequate protection for a creditor is to insure that the creditor receives the value for which he bargained prebankruptcy.") (internal citations omitted).

44.     The Debtor is only seeking to prime the liens granted in connection with the Prepetition Lender's Prepetition Loan Agreement by consent of the Prepetition Lender, mBank. The Debtor does not seek to prime the valid, perfected liens of any other creditors. Other than the priming of its own liens, the DIP Credit Agreement and the Interim Order do not provide for additional adequate protection to the Prepetition Lender.

**5.     The Debtor Has Exercised Its Business Judgment in Entering Into the DIP Credit Facility**

45.     A debtor's decision to enter into a postpetition lending facility under section 364 of the Bankruptcy Code is governed by the business judgment standard. *See In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994). To determine whether the business judgment test is met, "the court 'is required to examine whether a reasonable business person would make a similar decision under similar circumstances.'" *In re Dura Auto. Sys. Inc.*, No. 06-11202 (KJC), 2007 Bankr. LEXIS 2764, at *272 (Bankr. D. Del. Aug. 15, 2007) (quoting *In re Exide Techs., Inc.*, 340 B.R. 222, 239 (Bankr. D. Del. 2006)). Bankruptcy courts generally will defer to a debtor in possession's business judgment regarding the need for and the proposed use of funds, unless such decision is arbitrary and capricious. *In re Curlew Valley Assocs.*, 14 B.R. 506, 511–13 (Bankr. D. Utah 1981); *see also In re Trans World Airlines, Inc.*, 163 B.R. 964, 974 (Bankr. D. Del. 1994) (approving interim loan, receivables facility and asset-based facility based upon prudent business judgment of the debtor).

46.     As described above, the Debtor has exercised sound business judgment in determining the appropriateness of the DIP Facility and has satisfied the legal prerequisites to incur debt on the terms and conditions set forth in the DIP Facility. The DIP Facility contains terms that are the best available under the circumstances and was negotiated and approved at arm's length and in good faith. *See* DIP Declaration ¶ 12, 16.

47.     The funds provided by the DIP Facility are essential to enable the Debtor to maintain the value of its assets and business through the pendency of this chapter 11 case. *See* DIP Declaration ¶ 17. Indeed, without the funds from the DIP Facility, the Debtor will not be able to operate, which will materially and irreparably harm the going-concern value of its business which, in turn, will adversely affect the value ultimately received by creditors. *See id.*

48.     Accordingly, pursuant to sections 364(c) and (d) of the Bankruptcy Code, the Debtor respectfully submits that it should be granted authority to enter into the DIP Credit Agreement and obtain funds from the DIP Lender on the secured and administrative super-priority basis described herein.

## NOTICE

49.     Notice of the Motion has been provided to the following parties by overnight delivery: (a) the U.S. Trustee; (b) counsel for the Creditors Committee, (c) counsel for the DIP Lender and Prepetition Lender and (d) all other parties who have requested notice in this case. In light of the nature of the relief requested herein, the Debtor submits that no other or further notice is required.

## CONCLUSION

WHEREFORE, the Debtor respectfully requests that the Court enter an order granting interim relief (a) authorizing and approving the Debtor's entry into the DIP Credit Agreement, (b) modifying the automatic stay, and (c) scheduling a final hearing and approving the form and manner of notice thereof.

Dated: September 20, 2011
Wilmington, Delaware

**MORRIS, NICHOLS, ARSHT & TUNNELL LLP**

Eric D. Schwartz (No. 3134)
Daniel B. Butz (No. 4227)
Matthew B. Harvey (No. 5186)
1201 North Market Street, 18th Floor
P.O. Box 1347
Wilmington, DE 19899-1347
Telephone: (302) 658-9200
Facsimile: (302) 658-3989
Email: eschwartz@mnat.com
dbutz@mnat.com
mharvey@mnat.com

-and-

Timothy F. Nixon
Carla O. Andres
**GODFREY & KAHN, S.C.**
333 Main Street, Suite 600
P.O. Box 13067
Green Bay, WI 54307-3067
Telephone: (920) 436-7687
Facsimile: (920) 436-7988
Email: tnixon@gklaw.com
candres@gklaw.com

*Counsel for Debtor and Debtor in Possession*

6793758_1