## IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| In re | Chapter 11 |
| MANISTIQUE PAPERS, INC., | Case No. 11-12562 (KJC) |
| Debtor.[1] | <u>Hearing Date:</u><br>December 13, 2011 at 3:00 p.m. (ET)<br><u>Objection Deadline:</u><br>December 6, 2011 at 4:00 p.m. (ET) |

**DEBTOR'S MOTION FOR ENTRY OF AN ORDER: (I) (A) ESTABLISHING BIDDING PROCEDURES IN CONNECTION WITH SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF THE DEBTOR, INCLUDING CERTAIN BIDDING INCENTIVES, (B) APPROVING THE FORM AND MANNER OF NOTICES, (C) SETTING A SALE HEARING, AND (D) GRANTING RELATED RELIEF; (II) APPROVING THE SALE OF SUBSTANTIALLY ALL OF THE ASSETS OF THE DEBTOR FREE AND CLEAR OF LIENS, CLAIMS AND ENCUMBRANCES TO THE SUCCESSFUL BIDDER; AND (III) AUTHORIZING THE ASSUMPTION AND ASSIGNMENT OF CERTAIN <u>EXECUTORY CONTRACTS AND LEASES</u>**

The above-captioned debtor and debtor in possession (the "<u>Debtor</u>"), hereby moves (the "<u>Motion</u>") for the entry of an order (i) (a) establishing bidding procedures (the "<u>Bidding Procedures</u>") in connection with the sale (the "<u>Sale</u>") of substantially all of the assets of the Debtor (the "<u>Assets</u>"), including certain bidding incentives, (b) approving the form and manner of notices of the sale, (c) setting a hearing date to consider the approval of the sale (the "<u>Sale Hearing</u>"), and (d) granting related relief; (ii) approving the sale of the Assets free and clear of all liens, claims, encumbrances and interests of any kind, to the successful bidder; and (iii) authorizing the assumption and assignment of certain executory contracts and unexpired

---

[1] The last four digits of the Debtor's federal tax identification number are 0950. The Debtor's mailing address and corporate headquarters is 453 South Mackinac Avenue, Manistique, MI 49854-1399.

leases in connection with the sale of the Debtor's Assets. In support of the Motion, the Debtor respectfully represents as follows:

## JURISDICTION

1.      The Court has jurisdiction over this matter pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper pursuant to 28 U.S.C. §§ 1408 and 1409. This is a core proceeding pursuant to 28 U.S.C. § 157(b)(2).

2.      The statutory predicates for the relief sought herein are sections 105, 363(b), 363(f), 363(m), and 365 of title 11 of the United States Code (the "Bankruptcy Code"), Rules 2002, 6004, 6006, 9002, 9007 and 9008 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 6004-1 Local Rules of Bankruptcy Practice and Procedure of the United States Bankruptcy Court for the District of Delaware (the "Local Rules").

## BACKGROUND

A.      Introduction

3.      On August 12, 2011 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code. No trustee or examiner has been appointed in this case. The Debtor is operating its businesses as a debtor in possession pursuant to sections 1107 and 1108 of the Bankruptcy Code.

4.      The events leading up to the Petition Date and the facts and circumstances surrounding the Debtor's bankruptcy filing are set forth in the *Declaration Of Jon Johnson In Support Of The Debtor's Chapter 11 Petition And First Day Pleadings* (D.I. 2) (the "First Day Declaration") filed on the Petition Date. Additional facts regarding the Debtor's postpetition restructuring efforts and the Debtor's postpetition financing are set forth in the *Declaration Of Jon Johnson In Support Of Debtor's Motion For the Entry Of Interim And Final Orders (A) Authorizing And Approving Debtor-In-Possession Financing Pursuant To Sections 105, 361,*

- 2 -

*362, 363, And 364 Of The Bankruptcy Code, Bankruptcy Rules 2002 And 4001, And Local Rule 4001-2, (B) Modifying The Automatic Stay Under Section 362 Of The Bankruptcy Code, And (C) Scheduling A Final Hearing And Approving Form And Manner Of Notice Thereof* (Exhibit B to D.I. 147) (the "DIP Financing Declaration"), filed on September 20, 2011.

5. On August 23, 2011, the Office of the United States Trustee for the District of Delaware (the "U.S. Trustee") appointed an official committee of unsecured creditors in this case (the "Committee").

B. Debtor's Business

6. The Debtor operates a 100-percent recycled fiber paper mill facility (the "Mill") and is a leading North American producer of high-bright groundwood specialty papers. The Debtor's primary market is commercial advertising paper, with niche positions in educational workbooks, food service and office products. The Debtor is a low cost producer in its key Midwest markets.

7. The Mill—a nearly 100 year old facility along the Manistique River in Manistique, Michigan—is a critical component of the continued economic viability of the Manistique community. As of the Petition Date, the Debtor employed approximately 150 people within Manistique, making it one of the community's largest employers.

8. The Mill consists of a 500-ton per day recycled fiber facility, one paper machine, two boilers, and a waste water treatment facility. The Mill is able to produce 125,000 tons per year.

9. The Mill was built in 1914 by W.J. Murphy, then owner of the Minneapolis Tribune, and began manufacturing paper in 1920. The Debtor was sold to Mead

Corporation in 1940 and changed ownership twice in the following 20 years, ending up in the hands of the Marshall Field family in 1959. The Mill began recycling fiber as early as 1959.

10.    In 1984, the Debtor shut down its wood processing operations and converted to 100% recycled paper. In 1991, Kruger Inc. ("Kruger") acquired the Debtor from Marshall Field and completed a $13 million upgrade to a de-inked pulping system.

11.    In 2006, the Debtor was purchased from Kruger by a holding company made up of private equity firm, Merit Capital Partners ("Merit"), and minority shareholder DDFKD Investments, LP, was owned by Don and Dennis Kramer (the "Kramers") owners of Remark Paper Co., Inc. ("Remark"). The Kramers were in charge of managing the Mill from November of 2006 until January of 2011.

12.    Today, the Debtor purchases recovered fiber from municipalities throughout the United States, and sells its products throughout the United States and internationally. In addition to operating the Mill, the Debtor operates a complete wastewater treatment facility through which approximately five million gallons of wastewater is purified daily.

C.    The Debtor-in-Possession Financing Facility Maturity Date and Requirements

13.    The Debtor commenced this case due to a confluence of events—rising raw material costs, fluctuations in the paper industry, and changes in demand. Most significantly, though, the Debtor's prepetition lender, RBS Citizens, N.A. ("RBS"), terminated the Debtor's use of cash collateral just prior to the Petition Date and at a time of a year when the Debtor's receivables were insufficient to meet its input requirements. As a result, the Debtor shutdown operations of the Mill just prior to the Petition Date.

14.     On the Petition Date, the Debtor sought limited use of RBS's cash collateral, which was granted on an interim basis by an order (D.I. 25) (the "Interim Cash Collateral Order") entered at the first day hearing in this case held on August 15, 2011. The Interim Cash Collateral Order authorized interim use of cash collateral of RBS through a further hearing on the matter that was scheduled for August 25, 2011. The Interim Cash Collateral Order was entered with the understanding that the Debtor would seek replacement financing. Meanwhile, RBS filed a motion to convert this chapter 11 case to a case under chapter 7 of the Bankruptcy Code on August 17, 2011 (D.I. 45), to be heard in the event the Debtor could not obtain replacement financing.

15.     Through the efforts of the Debtor and its professionals, the Debtor was able to obtain financing on terms very favorable to the Debtor from mBank, a Michigan-chartered bank based in Manistique. The financing from mBank is partially backed by the State of Michigan's Michigan Strategic Fund (the "MSF"). Initially, mBank bought out RBS's secured debt, thereby becoming the Debtor's cash collateral lender, which was approved on a final basis by order of the Court (D.I. 140) on September 15, 2011. In addition, the Debtor sought, and mBank agreed to provide, additional financing to the Debtor up to $5 million.

16.     On October 19, 2011, the Court entered the *Final Order Under Bankruptcy Code Sections 105, 361, 362, 363, 364(c)(1), 364(c)(2), 364(c)(3), 364(d)(1), 364(e) and 507(b) and Bankruptcy Rules 2002, 4001 and 9014 (I) Authorizing Debtor to Obtain Postpetition Financing, and (II) Granting Adequate Protection to the DIP Lender* (D.I. 197) (the "Final DIP Order"), thereby authorizing the Debtor, on a final basis, to borrow funds from mBank on the terms and conditions set forth in the Final DIP Order and the Debtor-in-Possession Credit Agreement attached thereto (as amended, the "DIP Credit Agreement").

17.     Section 6.15 of DIP Credit Agreement requires the Debtor to notify mBank in writing as to whether the Debtor plans to either (i) draft and file a plan of reorganization or (ii) sell substantially all its Assets under section 363 of the Bankruptcy Code.

18.     In the Event that the Debtor notifies mBank, that it plans to sell substantially all its Assets under section 363 of the Bankruptcy Code, section 10.1(gg) of the DIP Credit Agreement requires the Debtor to perform each of the following actions within certain specified time periods as follows:

(i)     On or before October 31, 2011, file a sale and bid procedures motion, in form and substance satisfactory to Lender in its sole discretion;

(ii)    On or before November 10, 2011, obtain entry from the Bankruptcy Court of an order approving bid procedures in form and substance satisfactory to Bank in its sole discretion, setting forth a bid deadline of December 12, 2011;

(iii)   On or before December 15, 2011, conduct an auction, if necessary;

(iv)    On or before December 20, 2011, obtain entry of an order of the Bankruptcy Court approving the sale in form and substance satisfactory to the Lender in its sole discretion; and

(v)     On or before December 23, 2011, consummate such sale.

19.     Pursuant to section 6.15 of the DIP Credit Agreement, on October 24, 2011,[2] the Debtor notified mBank of its intention to pursue a sale of substantially all of its Assets pursuant to section 363 of the Bankruptcy Code.

_____

[2]     Section 6.15 of the DIP Credit Agreement provides October 15, 2011 as the deadline to make this election; however, the deadline was extended by the agreement of the parties. Additionally, mBank has agreed to modest extensions of the deadlines set forth in section 10.1(gg) of the DIP Credit Agreement. For example, the deadline to file a sale and bid procedures motion is now November 21, 2011.

D.   Hiring of an Investment Banker and Initial Marketing Efforts

20.   Shortly after mBank agreed to fund the Debtor, the Debtor and its professionals, in conjunction with the Committee and mBank (the "Consultation Parties"), began to solicit proposals from brokers and investment bankers to represent the Debtor and to conduct a Sale process.  On or about October 21, 2011, the Debtor, in consultation with the Consultation Parties, decided to engage Sanabe & Associates, LLC ("Sanabe") to act as the Debtor's investment banker in connection with a Sale of substantially all of its Assets.  The Debtor plans to file a retention application for Sanabe shortly.

E.   Necessity For Immediate Sale

21.   Despite the absence of a completed "stalking horse" bidder at this time, it is critical that the Debtor's Sale process move forward and a Sale of the Debtor's Assets conclude as quickly as possible.  Given the requirements of the DIP Credit Agreement, the Debtor believes that proceeding with the Sale process contemplated in this Motion, while maintaining the ability to establish a "stalking horse" sale process, is the best way to maximize the value of the Assets for the benefit of its estate, creditors and other stakeholders.

22.   The Debtor believes that the going concern value of the Debtor's business and, therefore, the consummation of the Sale or any alternative transaction that includes the Assets, will be jeopardized unless the relief sought by this Motion is authorized without delay.  Accordingly, the Debtor has concluded that: (a) despite the absence of an executed "stalking horse" agreement, a prompt and open sale of the Assets in which all interested buyers are encouraged to participate is the best way to maximize value for its estate, and (b) the proposed Bidding Procedures described herein are the most effective method of obtaining the highest and best offer for the Assets.

## OVERVIEW OF POSTPETITION SALE PROCESS

23.     In accordance with the proposed Bidding Procedures, the Debtor intends to implement under the supervision of this Court a competitive bidding and auction process for the Debtor's Mill and other Assets, which is designed to maximize value for the Debtor's estate, creditors and other stakeholders as expeditiously as possible.  The Debtor, with the aid of Sanabe, intends to canvass all known potentially interested bidders for the Assets in an effort to maximize interest on the part of potential bidders in the possible acquisition of the Debtor's Assets.

## RELIEF REQUESTED

A.     Summary Of Relief Requested

24.     By this Motion, the Debtor requests (a) the immediate entry of an order substantially in the form annexed as **Exhibit C** hereto (the "Procedures Order") (i) authorizing the scheduling of an auction of substantially all of the Assets, (ii) approving the Bidding Procedures, including, under the appropriate circumstances, the mid-process selection of a "stalking horse" to be approved at a hearing on January 17, 2012 at 3:00 p.m. (ET) (the "January Hearing"), (iii) approving the form and manner of notice of the Sale, (iv) setting a date for the Sale Hearing, and (v) granting related relief; (b) the entry after the Sale Hearing of an order substantially in the form annexed as **Exhibit D** hereto (the "Sale Order") approving the Sale of the Assets free and clear of all pledges, liens, security interests, encumbrances, claims, charges, options and interests thereon and there against (collectively, the "Liens") (with such Liens attaching to the proceeds of the Sale or Sales), to the successful bidder; and (c) authorizing the Debtor to assume and assign certain executory contracts and unexpired leases (the "Executory Contracts") other than those Executory Contracts that may be excluded under any purchase

agreement with the successful bidder (such Executory Contracts to be assumed and assigned pursuant to a purchase agreement, the "Assigned Contracts").

## B.     The Proposed Auction And Bidding Procedures

25.     The Debtor seeks approval of the bidding procedures set forth below and as **Exhibit 1** to the proposed Procedures Order (the "Bidding Procedures"), which are designed to allow the Debtor to solicit and consider bids for some or all of the Assets.

26.     Pursuant to Local Rule 6004-1, the following is a summary of certain key provisions of the proposed Bidding Procedures: [3]

(a)     Assets to be Sold

The Debtor is offering for sale, in one or more transactions, the Assets, which primarily consist of a 500-ton per day recycled fiber facility, one paper machine, two boilers, and a waste water treatment facility and as more specifically described in the form Asset Purchase Agreement (the "Form Purchase Agreement") attached as Exhibit 1 to the proposed Sale Order.

(b)     Stalking Horse Selection

The Debtor, in its discretion, in consultation with the Consultation Parties, may invite one or more Potential Bidders (as defined below) to submit a bid to serve as a "stalking horse" bid (the "Stalking Horse Bid") as part of the Bidding Procedures. Any such Stalking Horse Bid must be based upon the Form Purchase Agreement and may include break-up fees, other overbid protections and/or expense reimbursement provisions (collectively, the "Stalking Horse Protections"). To the extent that the Debtor does select a Stalking Horse Bid, the Debtor (i) will provide notice of the selection of such purchaser (the "Stalking Horse Purchaser") and asset purchase agreement (the "Stalking Horse Agreement") and an identification of any key terms required by Local Rule 6004-1, and (ii) shall seek approval of the Stalking Horse Bid and any Stalking Horse Fees at the January Hearing. After such approval, the Stalking Horse Agreement shall serve as the Form Purchase Agreement.

---

[3]     The description of the Bidding Procedures contained in this Motion is for informational purposes only, and in the event of any inconsistency between this description and the terms of the Bidding Procedures, the Bidding Procedures shall control.

(c)    Participation Requirements

In addition to the Bid Requirements set forth below, in order to participate in the bidding process or otherwise be considered for any purpose hereunder, including the submission of a Stalking Horse Bid, a person interested in purchasing the Assets (a "Potential Bidder") must deliver (unless previously delivered) to the Debtor and its advisors the following items (collectively, the "Participation Requirements"), not later than the Bid Deadline (as defined below) (or if a party wishes to have its bid considered as a Stalking Horse Bid, no later than January 12, 2012):

(1)    *Identification of Potential Bidder.* Concurrently with its Bid (as defined below), identification of the Potential Bidder, its principals, and the representatives thereof who are authorized to appear and act on their behalf for all purposes regarding the contemplated transaction;

(2)    *Corporate Authority.* Concurrently with its Bid, a statement that the Bid has been duly authorized, executed and delivered by such Potential Bidder and that no further corporate, equity holder or internal approvals of any sort are required;

(3)    *Disclosure.* Written disclosure of any connections or agreements with the Debtor, the Stalking Horse Purchaser, any other known Potential Bidder or Qualified Bidder (as defined below), and/or any officer, director or direct or indirect equity security holder of the Debtor; and

(4)    *Proof of Financial Ability to Perform.* Prior to or at the time of presentation of a Bid, written evidence that the Debtor concludes, upon consultation with the Debtor's advisors and the Consultation Parties and their advisors, demonstrates that the Potential Bidder has the necessary financial ability to close the contemplated transaction and provide adequate assurance of future performance under all contracts to be assumed in such contemplated transaction. Such information should include, inter alia, the following:

(i)   the Potential Bidder's current financial statements (audited if they exist);

(ii)  contact names and numbers for verification of financing sources;

(iii) evidence of the Potential Bidder's internal resources and proof of any debt or equity funding commitments that are needed to close the contemplated transaction; and

(iv)  any such other form of financial disclosure or credit-quality support information or enhancement acceptable to the Debtor demonstrating that such Potential Bidder

has the ability to close the contemplated transaction; provided, however, that the Debtor shall determine, in its reasonable discretion, and upon consultation with the Consultation Parties or advisors, whether the written evidence of such financial wherewithal is acceptable.[4]

Only Potential Bidders that execute and deliver, or have previously executed and delivered, a confidentiality agreement reasonably satisfactory to the Debtor are eligible to receive due diligence access or additional non-public information. If the Debtor determines that a Potential Bidder that has satisfied the above requirements does not constitute a Qualified Bidder, then such Potential Bidder's ability to receive due diligence access or additional nonpublic information shall terminate.

(d)     Qualified Bidders

A "Qualified Bidder" is a Potential Bidder (or combination of Potential Bidders whose bids for the Assets do not overlap and whose bids are combined for purposes of the determination of whether such Potential Bidders together constitute a Qualified Bidder) that delivers the documents and takes the other actions set forth in the Participation Requirements above, that otherwise satisfies the requirements of the Bid Procedures Order and the procedures set forth herein, and that the Debtor, in its discretion, determine is reasonably likely to submit a bona fide offer for the Assets and to be able to consummate a sale if selected as a Successful Bidder (defined below). The Debtor, as soon as is practicable, shall, upon consultation with the Consultation Parties, determine and notify the Potential Bidder with respect to whether such Potential Bidder is a Qualified Bidder. The Stalking Horse Purchaser (if selected) shall be deemed to be a Qualified Bidder for all purposes and is deemed to satisfy all Bid requirements as set forth below.

(e)     Bid Deadline

The deadline for submitting bids (a "Bid") by a Qualified Bidder shall be 5:00 p.m. on February 8, 2012 (the "Bid Deadline").

---

[4]     For the avoidance of doubt, the Debtor shall be under no obligation to consult with any party who submits a bid or proposal to acquire the Assets, and such party shall be treated as a Potential Bidder for purposes of these Bid Procedures

(f)     Bid Requirements

To be eligible to participate in the Auction, each Bid and each Qualified Bidder submitting such a Bid must be determined by the Debtor to satisfy each of the following conditions:

(1)     Good Faith Deposit.  Each Bid must be accompanied by a deposit (the "Good Faith Deposit") in the form of a certified check, cash or other immediately good funds payable to the order of the Debtor in the amount of 10% of the proposed Purchase Price; provided, however, that the Debtor reserves the right to modify the amount of the Good Faith Deposit in its discretion if necessary to accept a reduced deposit on account of bids for less than all the Assets.

(2)     Minimum Overbid.  The consideration proposed by the Bid must include only (1) cash or other consideration acceptable to the Debtor in its discretion in an amount of no less than the sum of (a) the Purchase Price in the Potential Bidder's Form Purchase Agreement, plus (b) the Stalking Horse Fees (if any) plus (c) $100,000 (subject to the Debtor's ability to aggregate Bids to determine the highest or otherwise best Bid) and (2) assumption of all Assumed Liabilities (if any) that would be assumed by the Stalking Horse Purchaser under the Form Purchase Agreement or additional cash or other consideration of an equivalent value as determined by the Debtor in its business judgment.

(3)     Irrevocable.  All Bids must be, and the Form Purchase Agreement is, irrevocable until one (1) business day after the Sale has closed (the "Termination Date").

(4)     The Same or Better Terms.  All Bids must be on terms that, in the Debtor's business judgment, and upon consultation with the Consultation Parties, are substantially the same or better than the terms of the Form Purchase Agreement. A Bid must include an executed form of agreement whereby the Qualified Bidder proposes to effectuate the contemplated transaction (the "Contemplated Transaction Documents"). A Bid shall include a copy of the Form Purchase Agreement marked to show all changes requested by the Bidder (including those related to the Purchase Price). The Contemplated Transaction Documents must include a commitment to close by no later than the outside closing date under the Form Purchase Agreement. A Bid should propose a contemplated transaction involving all or substantially all of the Assets; provided, however, that the

Debtor may consider proposals for less than substantially all of the Assets; and provided, further, that the Debtor may evaluate all Bids, in its reasonable discretion to determine whether such Bid or Bids maximizes the value of the Debtor's estate as a whole.

For the avoidance of any doubt, Bids do not have to be for substantially all of the Assets, provided that the other Bid Procedures requirements are satisfied.

(5) <u>Contingencies.</u> A Bid may not be conditioned on obtaining financing or any internal approval or on the outcome or review of due diligence, but may be subject to the accuracy in all material respects at the closing of specified representations and warranties at or before closing or the satisfaction in all material respects at the closing of specified conditions set forth in the Form Purchase Agreement, none of which shall, determined by the Debtor in its reasonable discretion, be more burdensome than those set forth in the Form Purchase Agreement.

(6) <u>Financing Sources.</u> A Bid must contain written evidence of a commitment for financing or other evidence that the Debtor determines, in its business judgment, demonstrates that the Bidder is no less able than the Stalking Horse Purchaser to consummate the sale. A Bid must further contain appropriate contact information for any financing sources. For the avoidance of doubt, the source and manner of financing of a Bid need not be the same as, or more certain than, the source and manner of financing of the Stalking Horse Purchaser.

(7) <u>No Fees Payable to Qualified Bidder.</u> Except with respect to the Stalking Horse Fees that may be provided to the Stalking Horse Purchaser pursuant to the Form Purchase Agreement, a Bid may not request or entitle the Qualified Bidder to any break-up fee, termination fee, expense reimbursement or similar type of payment. Moreover, by submitting a Bid, a Bidder shall be deemed to waive the right to pursue a substantial contribution claim under Bankruptcy Code § 503 related in any way to the submission of its Bid or the Bid Procedures.

(8) <u>Immediate Payment of Fees.</u> A Bid may not prohibit the immediate payment of the Stalking Horse Fees, if any, or any amounts to be paid to mBank as contemplated by the Sale Order.

(g)    Qualified Bids

A Bid received from a Qualified Bidder before the Bid Deadline that meets the above requirements and that satisfies the Bid Deadline requirement above shall constitute a "Qualified Bid," if the Debtor believes, in its reasonable discretion, and in Consultation with the Consultation Parties that such Bid would be consummated if selected as the Successful Bid. The Debtor shall have the right to reject any and all bids that it believes, in its reasonable discretion and in consultation with the Consultation Parties, do not comply with the Bid Procedures.

(h)    Credit Bids

mBank, as the secured party under the Debtor's prepetition and postpetition facilities, shall be deemed a Qualified Bidder and shall have all rights available under Bankruptcy Code § 363(k) to submit a credit bid (a "Credit Bid") on the Assets.  mBank must submit a Credit Bid no later than February 9, 2012.

(i)    Auction

If the Debtor receives at least one (1) Qualified Bid from a Qualified Bidder other than the Stalking Horse Purchaser prior to the Bid Deadline, or mBank timely submits a Credit Bid, then the Debtor shall notify the Stalking Horse Purchaser and each other Qualified Bidder that the Debtor intends to conduct an auction (the "Auction") to consider all Qualified Bids and to determine the highest or otherwise best bid with respect to the Assets. Such Auction, if any, will commence on February 13, 2012 at 10:00 a.m. (ET) at the offices of Morris Nichols Arsht & Tunnell, 1201 North Market Street, 18th Floor, Wilmington, Delaware 19801.  If the Auction is necessary, such Auction shall be conducted according to the following procedures:

> (1)    *Participation at Auction.* Only the Stalking Horse Purchaser and other Qualified Bidders may bid at the Auction. Only the authorized representatives of each of the Stalking Horse Purchaser, any other Qualified Bidders, the Debtor, and the Consultation Parties shall be permitted to attend the Auction; provided, however, that any creditors of the Debtor who wish to attend the Auction may do so but must give notice of their attendance to counsel to the Debtor in writing on or prior to the Bid Deadline.  Except as otherwise expressly set forth in the Bid Procedures, the Debtor may conduct the Auction in the manner it reasonably determines will result in the highest or otherwise best offer for the Assets. In the Debtor's discretion, after the conclusion of the Auction, the Debtor

may resume an auction for the sale of discrete assets and/or discrete groups of assets, if any, which are not included in the Successful Bid.

(2) *The Debtor Shall Conduct the Auction.* The Debtor and its professionals shall direct and preside over the Auction. At the start of the Auction, the Debtor shall describe the terms of the "Baseline Bid." All Bids made thereafter shall be Overbids (as defined below) and shall be made and received on an open basis, and all material terms of each Bid shall be fully disclosed to all other Qualified Bidders. The Debtor shall maintain a transcript of all Bids made and announced at the Auction, including the Baseline Bid, all Overbids and the Successful Bid.

(3) *Terms of Overbids.* An "Overbid" is any bid made at the Auction subsequent to the Debtor's announcement of the Baseline Bid. During the Auction, bidding shall begin initially with the Baseline Bid. Any Overbid after the Baseline Bid shall be made in initial increments of at least $100,000.00, which increments may be increased or reduced in the Debtor's discretion, in cash or other consideration acceptable to the Debtor; provided, however, that any overbids by the Stalking Horse Purchaser may credit bid the Stalking Horse Fees.

(4) *Consideration of Overbids.* The Debtor reserves the right, in its reasonable business judgment, in consultation with the Consultation Parties, to make one or more adjournments in the Auction to, among other things: facilitate discussions between the Debtor and individual Qualified Bidders; allow individual Qualified Bidders to consider how they wish to proceed; and give Qualified Bidders the opportunity to provide the Debtor with such additional evidence as the Debtor, in its reasonable business judgment, may require, that the Qualified Bidder has sufficient internal resources, or has received sufficient non-contingent debt and/or equity funding commitments, to consummate the proposed transaction at the prevailing Overbid amount. Should the Debtor determine that the aggregate value of an Overbid, including cash and non-cash consideration, fails to meet the required Overbid increment, the Debtor may inform the Qualified Bidder of the valuation of the Overbid and may afford such Qualified Bidder an opportunity to amend its Overbid to achieve the required Overbid increment.

(5) *Additional Procedures.* The Debtor may adopt rules for the Auction at or prior to the Auction that, in its reasonable

discretion, will better promote the goals of the Auction and that are not inconsistent with any of the provisions of the Bid Procedures Order.

    *(6)*    *Closing of Auction.* Upon conclusion of the bidding, the Auction shall be closed, and the Debtor shall immediately (1) identify the highest or best offer for the Assets (the "Successful Bid") and the entity submitting such Successful Bid (the "Successful Bidder") and (2) advise the Qualified Bidders of such determination. The Qualified Bidder that makes the next-highest and/or best bid to that of the Successful Bidder shall become the back-up bidder (the "Back-Up Bidder") and such Back-Up Bidder's final and highest and/or best bid (the "Back-Up Bid") shall remain open pending the closing of the Successful Bid.

(j)    <u>Acceptance of Successful Bid</u>

The Debtor's sale of the Assets to the Successful Bidder shall be subject to the approval of the Successful Bid by the Bankruptcy Court (the "Sale Hearing"), which shall be conducted by the Bankruptcy Court on February 16, 2012 at 2:00 p.m. (ET). The Debtor's presentation of a particular Qualified Bid to the Bankruptcy Court for approval does not constitute the Debtor's acceptance of such Qualified Bid. The Debtor will be deemed to have accepted a Qualified Bid only when the Qualified Bid has been approved by the Bankruptcy Court at the Sale Hearing. Closing shall take place no later than February 22, 2012.

(k)    <u>Procedures Governing Good Faith Deposits</u>

All Good Faith Deposits shall be subject to the jurisdiction of the Bankruptcy Court and shall be returned by the Debtor as soon as reasonably practicable after the closing of the Sale; <u>provided</u>, <u>however</u>, that if the Successful Bidder fails to consummate an approved Sale because of a breach or failure to perform on the part of such Successful Bidder, such Successful Bidder's Good Faith Deposit shall be forfeited to the Debtor, and the Debtor specifically reserves the right to seek all available damages from the defaulting Successful Bidder.

All Good Faith Deposits shall be held, subject to the provisions of the Procedures Order and these Bidding Procedures, by counsel for the Debtor or, in the Debtor's discretion, by a third-party escrow agent (either, a "Custodian") in a segregated non-interest bearing bank account. In the event of a dispute concerning the Debtor's right to retain any Good Faith Deposit, the Custodian shall have no liability to any bidder for the failure to return such Good Faith Deposit to the bidder, and the bidder's sole remedy shall be to seek relief from the Bankruptcy Court to compel the return of the Good Faith Deposit; <u>provided</u>, <u>however</u>, that nothing in the

Sale Procedures Order or these Bidding Procedures shall waive, release or restrict any right or remedy of any person arising from the wrongful disbursement or loss of any Good Faith Deposit.

27. The Debtor has determined in the exercise of its business judgment that the Sale of the Assets by an Auction is most likely to enable the Debtor to obtain the highest and best offers for such Assets within the necessary time frame, and thereby maximize the value of the estate for the benefit of creditors. Accordingly, the Debtor believes that the Bidding Procedures are in its best interest and the best interest of its estate.

28. The Debtor submits that the proposed Bidding Procedures are reasonable and consistent with past practices in other chapter 11 cases in this jurisdiction and are designed to allow the Debtor to obtain the greatest value for its Mill and other Assets. These procedures will ensure an orderly sale that is fair to the Debtor, its creditors, the Purchaser and any third-party entities who wish to participate in the bidding. At the same time, the Bidding Procedures are intended to eliminate any entity from bidding that lacks the financial ability to close under a transaction to acquire all or substantially all of the Assets.

C.    Bidding Incentives

29. By the time of the Sale, the selected Stalking Horse Purchaser, if any, will have expended, and likely will continue to expend, considerable time, money and effort pursuing the Sale and engaged in extensive and lengthy diligence and good faith negotiations.

30. In recognition of this anticipated expenditure of time, energy and resources and the benefit to the Debtor's estate of being the Stalking Horse Purchaser, the Debtor is hereby requesting that this Court award the Stalking Horse Protections to a chosen Stalking Horse Purchaser at the January Hearing.

D.     Notice

(i)     Notice Of The Motion And The Procedures Hearing

31.     The Debtor will provide notice of this Motion and its request for entry of the Procedures Order to (a) the U.S. Trustee, (b) counsel for mBank, (c) counsel for the Committee, and (d) those parties who have requested service of pleadings pursuant to Bankruptcy Rule 2002 (the "Service Parties"). The Debtor submits that no other or further notice need be given.

(ii)     Notice Of the Hearing to Choose a Stalking Horse Purchaser

32.     The Debtor will provide notice of the selection of the Stalking Horse Purchaser, if any, and any proposed Stalking Horse Protections prior to the January Hearing to (a) the U.S. Trustee, (b) counsel for mBank, (c) counsel for the Committee, and (d) those parties who have requested service of pleadings pursuant to Bankruptcy Rule 2002 (the "Service Parties"). The Debtor submits that no other or further notice need be given.

(iii)     Notice Of Sale Hearing

33.     On or before five (5) business days after entry of the Procedures Order (the "Mailing Date"), the Debtor (or its agents) shall serve the Procedures Order and the proposed Sale Order, by first class mail, postage prepaid, or hand delivery, as appropriate, upon the Service Parties. Additionally, the Debtor (or its agents) will forward courtesy copies of the Procedures Order and the proposed Sale Order to all entities known to the Debtor (or its agents) who have expressed an interest in a transaction with respect to the Assets during the last twelve months.

34.     On or before the Mailing Date, the Debtor (or its agents) shall serve by hand delivery or first class mail, postage prepaid, a notice of the proposed Sale of the Debtor's Assets, substantially in the form annexed as **Exhibit A** hereto (the "Sale Notice"), upon (a) the

Service Parties, (b) all taxing authorities or recording offices which have a reasonably known interest in the relief requested, (c) all federal, state, and local regulatory authorities with jurisdiction over the Debtor, (d) the office of the United States Attorney, (e) all insurers, and (f) all non-debtor parties to relevant contracts or leases (executory or other).

35.     Additionally, the Debtor (or its agents) will forward courtesy copies of the Sale Notice to all entities known to the Debtor (or its agents) who have expressed an interest in a transaction with respect to the Assets during the last twelve months. The Sale Notice is a detailed notice that provides, inter alia, the time and place of the Auction, the time and place of the Sale Hearing and the time fixed for objections to the proposed Sale.

(iv)     Objection Deadline & Procedures for Motion

36.     The Debtor requests that the Court require that any objection to relief requested in this Motion relating to the proposed Sale must: (a) be in writing; (b) be signed by counsel or attested to by the objecting party; (c) be filed with the Clerk of the Bankruptcy Court, 824 Market Street, 5th Floor, Wilmington, Delaware 19801 on or before **4:00 p.m. (ET) on February 9, 2012** (the "Objection Deadline"); and (d) be served so as to be received on or before the Objection Deadline by the following (collectively, the "Objection Notice Parties"): (i) Counsel to the Debtor, Morris, Nichols, Arsht & Tunnell LLP, 1201 North Market Street, 18th Floor, Wilmington, DE 19801 (Attn: Daniel B. Butz, Esq.) and Godfrey & Kahn, S.C., 333 Main Street, Suite 600, P.O. Box 13067, Green Bay, WI 54307 (Attn: Carla O. Andres, Esq.); (ii) Counsel to mBank, Potter Anderson & Corroon LLP, 1313 North Market Street, P.O. Box 951, Wilmington, Delaware 19899 (Attn: Jeremy W. Ryan, Esq.) and Kaye Scholer LLP, 70 West Madison Street, Suite 4100, Chicago, Illinois 60602 (Attn: Seth J. Kleinman); (iii) Counsel to the Official Committee of Unsecured Creditors, Lowenstein

Sandler, P.C., 65 Livingston Avenue, Roseland, New Jersey 07068 (Attn: Sharon L. Levine, Esq.) and Ashby & Geddes, P.A., 500 Delaware Avenue. Wilmington, Delaware 19899 (Attn: Amanda Winfree, Esq.); and (iv) Office of the United States Trustee, J. Caleb Boggs Federal Building, 844 King Street, Lock Box 35, Wilmington, DE 19801 (Attn: Mark Kenney, Esq.). The foregoing requirements are collectively referred to herein as the "General Objection Procedures."

37.     The Debtor further requests, pursuant to Bankruptcy Rule 9014, that the Court order that the failure of any objecting person or entity to file its objections by the Objection Deadline and in accordance with the General Objection Procedures or otherwise will be a bar to the assertion, at the Sale Hearing or thereafter, of any objection (except for any objection to the assumption and assignment of any Executory Contract, including without limitation any objection to the Debtor's proposed cure amount or the provision of adequate assurance of future performance under an Executory Contract pursuant to section 365(b)(1)(C) of the Bankruptcy Code), if authorized by the Court.

38.     In the event one or more objections to the relief requested in the Motion are filed, the Debtor requests the authority, pursuant to Local Bankruptcy Rule 9006-1(d), to file a consolidated reply to any objections on February 13, 2012.

E.     Procedures Governing Assumption And Assignment Of Executory Contracts

39.     As part of the Motion, the Debtor seeks, effective upon the closing of a Sale, to assume and assign the Assigned Contracts to the Purchaser, as appropriate. As noted above, the Assigned Contracts are those Executory Contracts that the Debtor ultimately will assume and assign to the Purchaser upon the closing of a Sale. The Executory Contracts consist of various contracts and leases, including, but not limited to, written and oral contracts, supply, service and customer contracts, permits, licenses and real and personal property leases.

40.     Because the Debtor may not know which Executory Contracts will ultimately be Assigned Contracts until after the Bidding Procedures are implemented and to provide adequate notice to each party to an Executory Contract of the potential assumption and assignment of its Executory Contract and the cure amount, if any, the Debtor believes would be owed in connection with the assumption and assignment of its Executory Contract, on or before January 10, 2012, the Debtor will serve on each party to a material Executory Contract notice of the Debtor's intention to assume and assign the Executory Contracts, substantially in the form annexed hereto as **Exhibit B** (the "Assignment Notice"). The Assignment Notice will include the Debtor's proposed cure amount as shown by the Debtor's books and records. The Assignment Notice also provides that any Purchaser's promise to perform under the Executory Contracts is deemed, absent objection, adequate assurance of future performance under the Executory Contracts. Finally the Assignment Notice provides that the Debtor reserves the right to remove any Executory Contracts from the Executory Contracts Schedule and from any other relevant schedules of the Purchase Agreement.

41.     The Debtor requests that the Court require that any objection to the assumption and assignment of any Executory Contract, including without limitation any objection to the Debtor's proposed cure amount or the provision of adequate assurance of future performance under an Executory Contract pursuant to section 365(b)(1)(C) of the Bankruptcy Code ("Adequate Assurance"), must: (a) comply with the General Objection Procedures; (b) identify the Executory Contract to which the objector is party; (d) describe with particularity any cure the claimant contends is required under section 365 of the Bankruptcy Code (the "Cure Claim") and identify the basis(es) of the alleged Cure Claim under the Executory Contract; (e) attach all documents supporting or evidencing the Cure Claim; and (f) if the response contains an

objection to Adequate Assurance, state with specificity what the objecting party believes is required to provide Adequate Assurance (collectively with the General Objection Procedures, the "Assigned Contract Objection Procedures"). If no objection is timely and properly filed and served in accordance with the Assigned Contract Objection Procedures, (x) the cure amount set forth in the Assignment Notice shall be controlling notwithstanding anything to the contrary in any Executory Contract or other document and the non-debtor party to the Executory Contract shall be forever barred from asserting any other claim arising prior to the assignment against the Debtor or the Purchaser as to such Executory Contract if it is an Assigned Contract and (y) the Purchaser's promise to perform under the Executory Contract shall be deemed adequate assurance of future performance under the Executory Contract.

## PROVISIONS THAT MAY IMPLICATE LOCAL RULE 6004-1(B)(IV)

42. Pursuant to Local Rule 6004-1(b)(iv), the Debtor is required to highlight certain provisions of this Motion relating to approval of the Sale and Bidding Procedures, including:

(a) Sale to Insider. The Debtor will consider sales to an insider of the Debtor. Nonetheless, any agreement will be negotiated in good faith and at arm's length, and the Debtor's believe that the Bidding Procedures are designed to provide for an open and fair sale process.

(b) Agreements with Management. None at this time as a proposed buyer is as of yet unknown.

(c) Releases. None at this time as a proposed buyer is as of yet unknown.

(d) Private Sale/No Competitive Bidding. If (i) no Qualified Bids have been received (other than a Stalking Horse Bid), (ii) mBank has elected not to submit a Credit Bid, and (iii) a Stalking Horse Purchaser has been chosen, no Auction will occur and the Debtor will seek approval of the Sale to such Stalking Horse Purchaser without an Auction.

(e) <u>Closing Deadlines</u>. The DIP Credit Agreement requires that any Sale be closed not later than February 22, 2012.

(f) <u>Good-Faith Deposit and Conditions for Forfeiture</u>. All Initial Bids must be accompanied by a Good-Faith Deposit of **10% of the Initial Bid**.

All Good Faith Deposits shall be subject to the jurisdiction of the Bankruptcy Court and shall be returned by the Debtor as soon as reasonably practicable after the closing of the Sale; <u>provided, however,</u> that if the Successful Bidder fails to consummate an approved Sale because of a breach or failure to perform on the part of such Successful Bidder, such Successful Bidder's Good Faith Deposit shall be forfeited to the Debtor, and the Debtor specifically reserves the right to seek all available damages from the defaulting Successful Bidder.

(g) <u>Interim Arrangements with Proposed Buyer</u>. None exist at this time as a proposed buyer is as of yet-unknown.

(h) <u>Use of Proceeds</u>. Upon the consummation of the Sale pursuant to this Order, the Debtor may pay such cash proceeds as are necessary to satisfy its secured obligations to mBank.

(i) <u>Tax Exemption</u>. None at this time as a proposed buyer is as of yet-unknown.

(j) <u>Record Retention</u>. None at this time as a proposed buyer is as of yet-unknown.

(k) <u>Sale of Avoidance Actions</u>. None at this time as a proposed buyer is as of yet-unknown.

(l) <u>Requested Findings as to Successor Liability</u> <u>See</u> proposed Sale Order, finding P.

(m) <u>Sale Free and Clear of Possessory Leasehold Interests, Licenses or Other Rights</u>. <u>See</u> proposed Sale Order, findings J and L and decretal paragraphs 6 and 7.

(n) <u>Credit Bid</u>. The proposed Bidding Procedures allow for credit bidding by mBank. <u>See</u> section IX of the proposed Bidding Procedures.

(o) <u>Relief from Bankruptcy Rule 6004(h)</u>. The Debtor seeks such relief with respect to the proposed Bidding Procedures Order and the proposed Sale Order. <u>See</u> paragraph 17 of the proposed Sale Order.

**BASIS FOR RELIEF**

A.     The Auction And Bidding Procedures

   1.     **The Bidding Procedures Are Appropriate Under The Circumstances**

   43.     A debtor may sell, after notice and a hearing, its assets outside the ordinary course of business. 11 U.S.C. § 363. Generally, to obtain approval of a proposed sale of assets, a debtor must demonstrate that the "proffered purchase price is the highest and best offer" under the circumstances of the case. See, e.g., Four B. Corp. v. Food Barn Stores, Inc. (In re Food Barn Stores, Inc.), 107 F.3d 558, 564-65 (8th Cir. 1997) (holding that in bankruptcy sales, "a primary objective of the Code [is] to enhance the value of the estate at hand); In re Integrated Res., 147 B.R. 650, 659 (S.D.N.Y. 1992) ("It is a well-established principle of bankruptcy law that the . . . Debtors' duty with respect to such sales is to obtain the highest price or greatest overall benefit possible for the estate.") (quoting Cello Bay Co. v. Champion Int'l Corn. (In re Atlanta Packaging Prods., Inc.), 99 B.R. 124, 131 (Bankr. N.D. Ga. 1988)).

   44.     The implementation of competitive bidding procedures to facilitate the sale of a debtor's assets outside of the ordinary course of a debtor's business is routinely approved by bankruptcy courts as a means of ensuring that such sale will generate the highest and best return for a debtor's estate. The Debtor submits that the foregoing Bidding Procedures and the opportunity for competitive bidding embodied therein will generate the highest or otherwise best offer for the Assets and therefore is designed to maximize the value of the Assets.

   45.     The Debtor believes that the exploration of a potential sale of the Assets through a prompt sale process is the best way to maximize the value of the Debtor's Assets for the benefit of its estate, creditors and other stakeholders. Accordingly, the Debtor, in its business judgment, has concluded that: (a) a prompt sale of the Assets is the best way to maximize value

for this estate, and (b) the proposed Bidding Procedures described herein are fair, reasonable, and appropriate and are designed to maximize recovery with respect to the sale of the Assets.

### 2. The Stalking Horse Protections Should Be Approved

46.     Pursuant to the Bidding Procedures, the Debtor may request that this Court approve bid protections for a Stalking Horse Purchaser at the January Hearing in advance of the Initial Bid Deadline and Auction.  The use of bid protections, such as a break-up fee, has become an established practice in chapter 11 asset sales involving the sale of significant assets because such bid protections enable a debtor to ensure a sale to a contractually committed bidder at a price the debtor believes is fair, while providing the debtor with the potential of obtaining an enhanced recovery through an auction process.

47.     Approval of the Stalking Horse Protections is governed by standards for determining the appropriateness of bidding incentives in the bankruptcy context established by the Third Circuit in Calpine Corp. v. O'Brien Envtl. Energy, Inc. (In re O'Brien Envtl. Energy, Inc.), 181 F.3d 527 (3d Cir. 1999) [hereinafter In re O'Brien].  In In re O'Brien, the Third Circuit concluded that "the determination whether break-up fees or expenses are allowable under § 503(b) must be made in reference to general administrative expense jurisprudence.  In other words, the allowability of break-up fees . . . depends upon the requesting party's ability to show that the fees were actually necessary to preserve the value of the estate." In re O'Brien, 181 F.3d at 535.

48.     The Third Circuit identified at least two instances in which bidding incentives may benefit the estate. First, a break-up fee and expense reimbursement may be necessary to preserve the value of the estate if assurance of the fee "promote[s] more competitive bidding, such as by inducing a bid that otherwise would not have been made and without which

bidding would have been limited." *Id* at 537. Second. if the availability of a break-up fee and expense reimbursement were to induce a bidder to research the value of the debtor and convert that value to a dollar figure on which other bidders can rely, the bidder may have provided a benefit to the estate by increasing the likelihood that the price at which the debtor is sold will reflect its true worth. *Id.*

49.     In In re O'Brien, the Third Circuit referred to nine factors that the bankruptcy court viewed as relevant in deciding whether to award a break-up fee and/or expense reimbursement: (1) the presence of self-dealing or manipulation in negotiating the break-up fee or expenses; (2) whether the fee harms, rather than encourages, bidding; (3) the reasonableness of the break-up fee or expenses relative to the purchase price; (4) whether the "unsuccessful bidder place[d] the estate property in a sales configuration mode to attract other bidders to the auction"; (5) the ability of the request for a break-up fee or expenses "to attract or retain a potentially successful bid, establish a bid standard or minimum for other bidders, or attract additional bidders"; (6) the correlation of the fee to a maximization of value of the debtor's estate; (7) the support of the principal secured creditors and creditors' committees of break-up fee or expenses; (8) the benefits of the safeguards to the debtor's estate; and (9) the "substantial adverse impact [of the break-up fee or expenses] on unsecured creditors, where such creditors are in opposition to the break-up fee." See In re O'Brien, 181 F.3d at 536.

50.     After considering the reasonableness of bidding incentives, courts have approved a range of break-up fees and/or expenses as a percentage of the purchase price as being appropriate under the facts and circumstances of the case. See In re Chi-Chi's Inc., Case No. 03-13063 (Bankr. D. Del. November 4, 2003) (fee of 5.1% permitted); In re Riverstone Networks, Case No. 06-10110 (Bankr. D. Del. February 24, 2006) (fee of 3% permitted); In re Radnor

Holdings, Case No. 0610894 (Bankr. D. Del. September 22, 2006) (aggregate fee and expense reimbursement of 3% permitted); Tama Beef Packing, Inc., 312 B.R. 192 (Bankr. N.D. Iowa 2004) (court noted that typical break-up fees are calculated at 3 to 4% of purchase price and upheld fee of 3.2%); In re Great Northern Paper, Inc., Case No. 03-10048 (Bankr. D. Me. February 18, 2003) (fee of 5.4% plus reimbursement of expenses upheld); In re Integrated Resources, Inc., 147 B.R. 650, 662 (S.D.N.Y. 1992) (break-up fee representing up to 3.2% of bidder's out-of-pocket expenses or 1.6% of the proposed purchase price; expert testified that outside of bankruptcy break-up fees average 3.3%).

51.     At the January Hearing, the Debtor will demonstrate that any Stalking Horse Protections: (a) are consistent with the "business judgment rule"; (b) satisfy the Third Circuit's "administrative expense" standard; and (c) are appropriate in this case. At the January Hearing, the Debtor will also demonstrate that the Stalking Horse Purchaser should be granted the protection of section 363(m) of the Bankruptcy Code.

B.     Sale Of The Assets Is A Product Of Reasonable Business Judgment

52.     Section 363(b)(1) of the Bankruptcy Code provides: "The trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate. . . ." Section 105(a) of the Bankruptcy Code provides in relevant part: "The court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title."

53.     Virtually all courts have held that approval of a proposed sale of substantially all of the assets of a debtor under section 363 of the Bankruptcy Code outside the ordinary course of business and prior to the confirmation of a plan of reorganization is appropriate if a court finds that the transaction represents a reasonable business judgment on the part of the trustee or debtor-in-possession. See In re Abbotts Dairies of Pennsylvania, 788 F.2d

143 (3d Cir. 1986); In re Delaware & Hudson Ry. Co., 124 B.R. 169, 176 (D. Del. 1991) (holding that the following non-exclusive list of factors may be considered by a court in determining whether there is a sound business purpose for an asset sale: "the proportionate value of the asset to the estate as a whole; the amount of elapsed time since the filing; the effect of the proposed disposition of [sic] the future plan of reorganization; the amount of proceeds to be obtained from the sale versus appraised values of the property; and whether the asset is decreasing or increasing in value."); In re Stroud Ford, Inc., 164 B.R. 730, 732 (Bankr. M.D. Pa 1993); Titusville Country Club v. Pennbank (In re Titusville Country Club), 128 B.R. 396, 399 (Bankr. W.D. Pa. 1991); In re Industrial Valley Refrigeration & Air Conditioning Supplies Inc., 77 B.R. 15, 21 (Bankr. E.D. Pa. 1987); In re Lionel Corp., 722 F.2d 1063 (2d Cir. 1983); Stephens Indus., Inc. v. McClung, 789 F.2d 386, 391 (6th Cir. 1986); In re Ionosphere Clubs, Inc., 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); In re Phoenix Steel Corp., 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that the elements necessary for approval of a section 363 sale in a chapter 11 case are "that the proposed sale is fair and equitable, that there is a good business reason for completing the sale and the transaction is in good faith").

54.    The "sound business judgment" test requires a trustee or debtor-in-possession to establish four elements: (1) that a sound business purpose justifies the sale of assets outside the ordinary course of business; (2) that accurate and reasonable notice has been provided to interested persons; (3) that the trustee has obtained a fair and reasonable price; and (4) good faith.  Abbotts Dairies, 788 F.2d 143; In re Titusville Country Club, 128 B.R. at 399; In re Sovereign Estates, Ltd., 104 B.R. 702, 704 (Bankr. E.D. Pa. 1989); Phoenix Steel Corp., 82 B.R. at 335-36; see also Stephens Indus., 789 F.2d at 390; In re Lionel Corp., 722 F.2d at 1071.[5]

---

[5]    Lionel's "sound business purpose test" replaces an older rule which held that sales of
(Continued . . . )

55.     Additionally, prior to and after enactment of the Bankruptcy Code, courts have permitted a proposed sale of all or substantially all assets of a trustee outside the ordinary course of business if such a sale is necessary to preserve the value of assets for the estate, its creditors or interest holders.  See Abbotts Dairies, 788 F.2d at 143; In re Lionel Corp., 722 F.2d at 1063 (passim); In re Equity Funding Corp. of America, 492 F.2d 793, 794 (9th Cir. 1974) ("Other circuits have recognized the power of the bankruptcy court under Chapter X to authorize a sale of the Debtors' property under less than emergency conditions where such sale is necessary to avoid deterioration in the value of the assets").

56.     The proposed Sale of the Assets meets the "sound business reason" test. First, sound business purposes justify the Sale.  The Debtor believes that a prompt sale of the Assets by auction presents the best opportunity to realize the maximum value of the estate's assets for distribution to creditors prior to the maturity under the DIP Credit Agreement. Furthermore, the Debtor continues to incur administrative costs that, if a sale is not consummated promptly, likely will erode the proceeds that can be realized for the Debtor's creditors from the Sale of the Assets, including such costs as maintenance, utility charges, employee wages, salary, benefits and overhead, and administrative bankruptcy costs.  See In re Lionel Corp., 722 F.2d at 1071 (of factors for court to evaluate on motion under section 363(b), "most important perhaps, [is] whether the asset is increasing or decreasing in value").

---

(. . . continued.)

substantially all of a debtor's assets prior to the confirmation of a plan of reorganization could only be made in emergencies, i.e. when the assets to be sold were "wasting" or perishable.  Lionel, 722 F.2d at 1071.  The Third Circuit adopted the emergency rule in In re Solar Mfg. Corp., 176 F.2d 493, 494-95 (3d Cir. 1949).  While most bankruptcy courts have determined that the passage of the Bankruptcy Code and the Third Circuit's own opinion in Abbotts Dairies have replaced Solar Mfg. Corp. with the Lionel "sound business purpose test, e.g., Titusville, 128 B.R. at 399; Industrial Valley, 77 B.R. at 21, some courts have declined to decide which test prevails.  E.g., Delaware & Hudson Ry., 124 B.R. at 179.

57.     The proposed Sale also meets the other factors of the "sound business reason" test.  As part of this Motion, the Debtor has sought to establish procedures for notice to creditors, other prospective bidders and other parties in interest.  Under the circumstances of this case, the Debtor submits that the notice period proposed satisfies the requirements of the Bankruptcy Rules, see Bankruptcy Rule 2002, and provides sufficient time for parties in interest to submit objections to the proposed sale and for bidders to formulate and submit competing proposals.  Further, the Bidding Procedures are also designed to maximize the value received for the Assets.  Along with the Debtor's marketing process, the Bidding Procedures are designed to ensure that the Purchased Assets will be sold for the highest or otherwise best possible purchase price under the current circumstances in satisfaction of the third prong of the Abbotts Dairies test.

58.     Finally, the proposed sale satisfies the good faith requirement of Abbotts Dairies.  The Debtor submits that the results of the Auction will be the product of good faith, arm's length negotiations with respect to the price and other terms of the Sale of the Assets between the Debtor and highest and best bidder at the conclusion of the Auction.

59.     As set forth above, the Debtor has determined, in the exercise of its sound business judgment, that the sale of the Assets to the highest and best bidder at the Auction may be appropriate and in the best interests of its estate and creditors.  The sale of the Assets at the Auction will afford the Debtor's estate an opportunity to maximize the recoveries to creditors.  Accordingly, the Debtor requests that the Court approve the sale of the Assets to the highest or otherwise best bidder at the Auction presented to the Court at the Sale Hearing; provided, however, that the Debtor reserves the right not to accept any of the bids received.

C. Sale Of The Assets Does Not Require the Appointment of a Consumer Privacy Ombudsman

60.     Under section 363(b)(1) of the Bankruptcy Code, if the sale of a consumer customer list containing personal information relating to individual persons is inconsistent with the Debtor's consumer privacy policy, section 332 governs the appointment of a consumer privacy ombudsman. 11 U.S.C. § 363(b)(1). Because the Debtor's business is selling to retailers and commercial end-users, none of the Debtor's customers are individuals. Therefore, section 363(b)(1) does not apply and a consumer privacy ombudsman is not required.

D. Sale Of The Assets Should Be Free And Clear Of Liens

61.     Pursuant to section 363(f) of the Bankruptcy Code, the Debtor seeks authority to sell and transfer the Assets to the Purchaser free and clear of all Liens, with such Liens to attach to the proceeds of the sale of the Assets, subject to any rights and defenses of the Debtor and other parties in interest with respect thereto. Section 363(f) of the Bankruptcy Code provides, in pertinent part:

> The trustee may sell property under subsection (b) or (c) of this section free and clear of any interest in such property of an entity other than the estate, only if —
>
> (1)     applicable nonbankruptcy law permits sale of such property free and clear of such interest;
>
> (2)     such entity consents;
>
> (3)     such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;
>
> (4)     such interest is in bona fide dispute; or
>
> (5)     such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f). See also Citicorp Homeowners Serv., Inc. v. Elliot (In re Elliot), 94 B.R. 343, 345 (E.D. Pa. 1988) (noting that section 363(f) of the Bankruptcy Code is written in the

disjunctive; therefore, a court may approve a sale "free and clear" provided at least one of the subsections is met). Furthermore, courts have held that they have the equitable power to authorize sales free and clear of interests that are not specifically covered by section 363(f). <u>See, e.g.</u>, <u>In re Trans World Airlines, Inc.</u>, 2001 WL 1820325, at *3, 6 (Bankr. D. Del. Mar. 27, 2001); <u>Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)</u>, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987).

62.     A sale free and clear of Liens is necessary to maximize the value of the Assets. A sale subject to Liens would result in a lower purchase price and be of substantially less benefit to the Debtor's estate. A sale free and clear of Liens is particularly appropriate under the circumstances because any Lien in, to or against the Assets that exists immediately prior to the closing of the Sale will attach to the sale proceeds with the same validity, priority, force and effect as it had at such time, subject to the rights and defenses of the Debtor or any party in interest. The Debtor submits that holders of Liens will be adequately protected by the availability of the proceeds of the Sale to satisfy their Liens. Thus, the Sale satisfies sections 363(f) of the Bankruptcy Code. Moreover, any holder of a Lien that receives notice of the Sale and which fails to object to the sale of the Assets free and clear of Liens should be deemed to consent to the Sale, thereby complying with Section 363(f)(2) of the Bankruptcy Code.

E.     The Assumption And Assignment Of Executory Contracts And Unexpired Leases Should Be Authorized

63.     Section 365(f)(2) of the Bankruptcy Code provides that:

The trustee may assign an executory contract or unexpired lease of the debtor only if --

(A)     the trustee assumes such contract or lease in accordance with the provisions of this section; and

> (B) adequate assurance of future performance by the assignee of such contract or lease is provided, whether or not there has been a default in such contract or lease.

11 U.S.C. § 365(f)(2). Under Bankruptcy Code section 365(a), a debtor, "subject to the court's approval, may assume or reject any executory contract or unexpired lease of the debtor." 11 U.S.C. § 365(a). Bankruptcy Code section 365(b)(1), in turn, codifies the requirements for assuming an unexpired lease or executory contract of a debtor. This subsection provides:

> (b) (1) If there has been a default in an executory contract or unexpired lease of the debtor, the trustee may not assume such contract or lease unless, at the time of assumption of such contract or lease, the trustee -

> (A) cures, or provides adequate assurance that the trustee will promptly cure, such default other than a default that is a breach of a provision relating to the satisfaction of any provision (other than a penalty rate or penalty provision) relating to a default arising from any failure to perform nonmonetary obligations under an unexpired lease of real property, if it is impossible for the trustee to cure such default by performing nonmonetary acts at and after the time of assumption, except that if such default arises from a failure to operate in accordance with a nonresidential real property lease, then such default shall be cured by performance at and after the time of assumption in accordance with such lease, and pecuniary losses resulting from such default shall be compensated in accordance with the provisions of this paragraph;

> (B) compensates, or provides adequate assurance that the trustee will promptly compensate, a party other than the debtor to such contract or lease, for any actual pecuniary loss to such party resulting from such default; and

> (C) provides adequate assurance of future performance under such contract or lease.

11 U.S.C. § 365(b)(1).

64. The meaning of "adequate assurance of future performance" depends on the facts and circumstances of each case, but should be given "practical, pragmatic construction."

- 33 -

EBG Midtown South Corp. v. McLaren/Hart Env. Eng'g Corp. (In re Sanshoe Worldwide Corp.), 139 B.R. 585, 593 (S.D.N.Y. 1992); In re Prime Motor Inns Inc., 166 B.R. 993, 997 (Bankr. S.D. Fla. 1994) ("[a]lthough no single solution will satisfy every case, the required assurance will fall considerably short of an absolute guarantee of performance"); Carlisle Homes, Inc. v. Azzari (In re Carlisle Homes, Inc.), 103 B.R. 524, 538 (Bankr. D.N.J. 1988).

65.     Among other things, adequate assurance may be provided by demonstrating the assignee's financial health and experience in managing the type of enterprise or property assigned. See, e.g., In re Bygaph, Inc., 56 B.R. 596, 605-06 (Bankr. S.D.N.Y. 1986) (adequate assurance of future performance is present when prospective assignee of lease from debtor has financial resources and has expressed willingness to devote sufficient funding to business in order to give it strong likelihood of succeeding).

66.     To the extent any defaults exist under any Executory Contract that is an Assigned Contract, any such default will be promptly cured or adequate assurance that such default will be cured will be provided prior to the assumption and assignment.  If necessary, the Debtor will adduce facts at the Sale Hearing to show the financial credibility of the Purchaser and willingness and ability to perform under the contracts to be assumed and assigned.  The Sale Hearing will therefore provide the Court and other interested parties the opportunity to evaluate and, if necessary, challenge the ability of the Purchaser to provide adequate assurance of future performance under the contracts to be assumed and assigned, as required under section 365(b)(1)(C) of the Bankruptcy Code.  The Court should therefore authorize the Debtor to assume and assign contracts and leases as forth herein.

**F.** Waiver Of Automatic Ten Day Stay Under Bankruptcy Rules 6004(h) And 6006(d)

67. Bankruptcy Rule 6004(h) provides that an "order authorizing the use, sale, or lease of property . . . is stayed until the expiration of 14 days after entry of the order, unless the court orders otherwise." Similarly, Bankruptcy Rule 6006(d) provides that an "order authorizing the trustee to assign an executory contract or unexpired lease . . . is stayed until the expiration of 14 days after the entry of the order, unless the court orders otherwise." The Debtor requests that the Bidding Procedures Order and the Sale Order be effective immediately by providing that the fourteen (14) day stays under Bankruptcy Rules 6004(h) and 6006(d) are waived.

68. The purpose of Bankruptcy Rules 6004(h) and 6006(d) is to provide sufficient time for an objecting party to appeal before an order can be implemented. <u>See</u> Advisory Committee Notes to Fed. R. Banks. P. 6004(h) and 6006(d). Although Bankruptcy Rules 6004(h) and 6006(d) and the Advisory Committee Notes are silent as to when a court should "order otherwise" and eliminate or reduce the ten-day stay period, Collier on Bankruptcy suggests that the fourteen (14) day stay period should be eliminated to allow a sale or other transaction to close immediately "where there has been no objection to the procedure." 10 COLLIER ON BANKRUPTCY ¶6064.09 (L. King, 15th rev. ed. 1988). Furthermore, <u>Collier's</u> provides that if an objection is filed and overruled, and the objecting party informs the Court of its intent to appeal, the stay may be reduced to the amount of time actually necessary to file such appeal. <u>Id</u>.

69. Accordingly, the Debtor hereby requests that the Court waive the fourteen (14) day stay period under Bankruptcy Rules 6004(h) and 6006(d).

70.     The Debtor needs to close this Sale as soon as possible after all closing conditions have been met or waived.

G.     <u>Request for Sale Hearing</u>

71.     The Debtor respectfully requests that the Court schedule the Sale Hearing for February 16, 2012 at 2:00 p.m. (ET).

**<u>NO PRIOR REQUEST</u>**

72.     No previous request for the relief sought herein has been made to this or any other court.

WHEREFORE, the Debtor respectfully requests that the Court (a) enter the Procedures Order, substantially in the form attached as **Exhibit C** hereto; (b) after conducting a Sale Hearing, enter the Sale Order, substantially in the form attached as **Exhibit D** hereto; and (c) grant the Debtor such other and further relief as is just and proper.

Dated: November 21, 2011
      Wilmington, Delaware

MORRIS, NICHOLS, ARSHT & TUNNELL LLP

_____
Eric D. Schwartz (No. 3134)
Daniel B. Butz (No. 4227)
Matthew B. Harvey (No. 5186)
1201 North Market Street, 18th Floor
Wilmington, DE 19899
Telephone: (302) 658-9200
Facsimile: (302) 658-4673

-and-

Timothy F. Nixon
Carla O. Andres
GODFREY & KAHN, S.C.
333 Main Street, Suite 600
P.O. Box 13067
Green Bay, WI 54307-3067
Telephone: (920) 436-7687
Facsimile: (920) 436-7988

Counsel for Debtor and Debtor in Possession

4574672.6